68 F.3d 973
 64 USLW 2289
 Robert L. HARTMANN; Tambra R. Hartmann; Jeffrey Whitlow;
Julie Whitlow; Charles Rhodes; and Bessie
Rhodes, Plaintiffs-Appellants,
v.
Michael P.W. STONE, Secretary, United States Department of
the Army; John Miller, Major General, Division and Post
Commander, Department of the Army; Richard Holcomb, Major,
Chief Family Support Division, Department of the Army;
Willa D. Gray, Director, Family Child Care, Department of
the Army, Defendants-Appellees.
 No. 93-6585.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 30, 1995.
Decided Nov. 2, 1995.
 
 Michael W. Troutman (briefed), Fowler, Measle & Bell, Lexington, KY, Amy E. Dougherty (argued), The Rutherford Institute of Kentucky, Bluegrass Chapter, Inc., Lexington, KY, for Plaintiffs-Appellants.
 David L. Huber, Asst. U.S. Attorney, Office of the U.S. Attorney, Louisville, KY, Michael Jay Singer, U.S. Department of Justice, Appellate Staff, Civil Division, Washington, DC, Patricia A. Millett (argued and briefed), Department of Justice, Civil Division, Washington, DC, for Defendants-Appellees.
 Before: WELLFORD, BOGGS, and SILER, Circuit Judges.
 BOGGS, J., delivered the opinion of the court, in which SILER, J., joined. WELLFORD, J. (pp. 986-87), delivered a separate concurring opinion.
 BOGGS, Circuit Judge.
 
 
 1
 Robert Hartmann, Tambra Hartmann, Jeffrey Whitlow, Julie Whitlow, Charles Rhodes, and Bessie Rhodes (all of the plaintiffs in this case will be collectively referred to as "Hartmanns") sued the various military Defendants-Appellees (collectively referred to as "the Army") because of restrictions in its Family Child Care (FCC) program--an on-base day-care program that regulated the placement of children, at their parent's choice and expense, in the homes of certain "Care Providers" while their parents were performing military duties. The regulations governing this program prohibit Providers from having any religious practices, such as saying grace or reading Bible stories, during their day-care program. The Plaintiffs-Appellants are military families with small children who wish to arrange for or provide day care for their children under the auspices of the FCC, without being limited by the religious restrictions. They claim that certain of the day care regulations violate, among other things, their First Amendment rights to free exercise of religion and free speech. The district court granted summary judgment to the Army. We hold that the Army's restrictions are a violation of the First Amendment and we reverse.
 
 
 2
 * Robert Hartmann, Jeffrey Whitlow, and Charles Rhodes are active duty members of the Army stationed at Fort Campbell, Kentucky. Tambra Hartmann, Julie Whitlow, and Bessie Rhodes are the servicemen's wives. Tambra Hartmann was also a provisionally certified Provider for the Family Child Care Program (FCC) until she discovered Army regulations prohibited her from providing any religious activities for her children or those children whose parents had requested such activities. The Hartmanns (as do the other two couples) have young children who often require extended care and they want to arrange on-base Christian-oriented care for their children.
 
 
 3
 Army Regulation 608-10, C-2 Compliance Item 1, defines the scope of the relevant regulations. The Compliance Item provides that:
 
 
 4
 a. Standard Requires.
 
 
 5
 ...
 
 
 6
 * * *
 
 
 7
 (6) Individuals providing unauthorized care in Government owned or leased housing on Government property brought under oversight of the Family Child Care system.
 
 
 8
 ...
 
 
 9
 * * *
 
 
 10
 b. Standard Excludes.
 
 
 11
 (1) Care in--
 
 
 12
 ...
 
 
 13
 * * *
 
 
 14
 (c) Chapel settings where parents are on the premises (e.g., Sunday services).
 
 
 15
 (d) Religious programs of limited duration (e.g., Vacation Bible School).
 
 
 16
 (2) Care--
 
 
 17
 (a) In the home of or by parent, guardian or relative.
 
 
 18
 (b) By the individual providing short term intermittent care that does not exceed 10 child care hours per week on a regular basis.
 
 
 19
 (c) By the individual in the child's home, except when children other than the provider's and homeowner's are involved.
 
 
 20
 c. Intent. To ensure use of standards and regulatory guidance which provide a common framework and an enforcement mechanism for compliance. To ensure continuity and consistency of child care operations Armywide. To ensure child care provided under the sponsorship of Army or in Army-owned facilities is safe and appropriate, regardless or whether money/fees are exchanged. Intent is not to restrict or preclude occasional care provided between families/friends e.g., while attending a class, shopping, doctors appointments, evening recreational activities, weekend trips etc., which do not occur on a regular basis. Ten child care hour limit is a baseline for regulatory oversight frequently used by State, county, and other comparable licensing agencies. Ten child care hour limit is not intended to apply when multiple children in one family are involved e.g., neighbor care of three children in one family for the afternoon while parents are shopping. Intent is to preclude children from being in unregulated care setting on a regular basis.
 
 
 21
 Any care that does not fit within the exceptions described above must comply with Army regulations. AR 608-10 Sec. 6-2(a)("Unauthorized child care is prohibited in Government owned or leased housing or in family housing located on the installation except as authorized by this regulation."). The specific dispute before us centers on certain provisions of Army Regulation 608-10 that govern the Family Child Care Program ("FCC"). The FCC is a regulatory umbrella governing the placement of children in private homes, often for long-term care. The Army implemented the FCC regulations in response to concerns about the quality and availability of long-term care for members of the Army.
 
 
 22
 Indeed, the Army regulations themselves state that "[T]he military family does not have the stability of an established neighborhood or the proximity of relatives to allow for a constant and reliable child care plan. Off-post civilian programs are often inaccessible, unaffordable, and have limited operating hours. Most private child care operations do not provide care for infants or toddlers, have no hourly services, and have a waiting list for vacancies. Off-post family day care homes are often not licensed or certified and may be unmonitored for health, safety, and quality or service factors." AR 608-10 Sec. 1-7b.
 
 
 23
 The Army regulations expressly recognize the large cost advantage for the FCC program, concluding that "[f]ees generally represent a 20-25 percent advantage over local civilian rates for comparable services." AR 608-10, C-7 Compliance Item 6a(4). See also AR 608-10 Sec. 1-5c(3) (expressly authorizing the creation of on-base child care programs if "[o]ff-post child care is too costly"). Similarly, the Army regulations recognize that the FCC program will provide "options that reduce the conflict between parental responsibilities and unit mission requirements. Increasing numbers of sole and dual military parents, coupled with an increase in working spouses and the frequent relocation of Service families, have combined to increase demand for child care." AR 608-10 Sec. 1-7a.
 
 
 24
 Therefore, the Army has designed "options with various types of service, locations, hours of operation, and fee schedules that are responsive to the needs of military families living both on and off-post." AR 608-10 Sec. 1-7e. These programs include the FCC program at issue here. These FCC "homes within government owned or leased quarters, or privately owned housing on an installation offer a family atmosphere with a limited number of children, flexible hours, and the capability of addressing special requirements." AR 608-10 Sec. 1-7e(2).
 
 
 25
 According to Hartmann's brief, before March 1990, FCC Providers could "pray before meals and at other times, read Bible stories, and attend church worship services as agreed to by the parents and the Provider." This changed when the Army adopted AR 608-10, Sec. 1-8i, which states:
 
 
 26
 The dissemination of religious information (e.g. grace) or materials is prohibited as well as providing program activities that teach or promote religious doctrine (Programs operated by chaplains are exempted from this restriction.).
 
 
 27
 The Army Regulation has a "compliance item" detailing the standards of the prohibition. C-10, Compliance Item 9 states, in part:
 
 
 28
 Religious materials or activities specifically designed to teach or promote religious doctrine are not permitted....
 
 
 29
 a ... (2) Does not permit religious Bible stories, pictures, prayers including grace at meals.[1]
 
 
 30
 (3) Does not permit special purpose "religious" FCC homes.
 
 
 31
 The regulation goes on to allow "educationally based" discussions about religion when pertaining to "cultural heritage" or "differences based on belief systems," and makes it clear that the "[r]estriction is not meant to prohibit holiday celebrations." As such, "Christmas trees, menorahs, creches, etc., are considered appropriate topics for an integrated developmental curriculum." It also does not require the Provider to remove religious decorations and symbols from the home so long as they are not used in a "proselytizing manner." AR 608-10, C-10, Compliance Item 9b.
 
 
 32
 Army regulations require that Providers undergo a certification procedure before they begin caring for children on Army property. This program provides basic training in various areas of child care for Providers. Initially, prospective Providers must attend 20 hours of classes. Then, after receiving a provisional certification, they must attend three additional hours of class per month for six months. At the conclusion of this period, they receive their certification. After certification, the regulations require that they attend 24 hours of class each year. Furthermore, every three years they must take a refresher course in child abuse identification, CPR and first aid, and communicable diseases and administration of medicine. See AR 608-10 Sec. 6-20(e).
 
 
 33
 Once the Army certifies Providers, they are subject to specific Army regulations covering every conceivable activity and aspect of the home. See, e.g., AR 608-10 Sec. 6-47b(1)(g) ("Handrails will be provided where there are more than two entrance steps to the home. The handrail will be at least 30 inches high and have intermediate rails or an ornamental design, such that a sphere 6 inches in diameter cannot pass through any openings in such handrails."). The Army enforces the requirements through frequent announced and unannounced inspections by Army and government health personnel.
 
 
 34
 The Hartmanns filed suit August 3, 1992, contending that the Army regulation violates their First Amendment rights to free exercise and free speech and their Fifth Amendment rights to Equal Protection and "Parental Liberty." They sought a declaratory judgment and an injunction against enforcement of the regulations, and an order allowing them to arrange for a Provider who will provide religious training for their children.
 
 
 35
 After the parties filed briefs and presented oral argument, a Magistrate Judge filed a report and recommendation concluding that there was no constitutional violation. After the Hartmanns filed objections with the district court, the Magistrate Judge modified his opinion, but still concluded that there was no constitutional violation. The district court adopted the Magistrate Judge's conclusions on October 8, 1993 and entered summary judgment for the Army. The Hartmanns filed this timely appeal on December 6, 1993.
 
 II
 
 36
 This court reviews the district court's grant of summary judgment on the service member's constitutional claims de novo. Newman v. Voinovich, 986 F.2d 159, 161 (6th Cir.) (plenary review of dismissal of constitutional claims), cert. denied, --- U.S. ----, 113 S.Ct. 3041, 125 L.Ed.2d 727 (1993).
 
 
 37
 Initially we must address two related points. The Magistrate Judge's first report stated that the regulation was neutral and generally applicable. See Employment Div., Dept. of Human Resources of Oregon v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) and Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, --- U.S. ----, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). This conclusion is erroneous.[2] A rule that uniformly bans all religious practice is not neutral. Apparently the Magistrate Judge considered "neutral" to mean that the regulation did not distinguish among religions (e.g., allowing Catholics and Mormons to say grace but not Methodists and Lutherans). However, the Supreme Court has made it clear that "neutral" also means that there must be neutrality between religion and non-religion. "[T]he First Amendment forbids an official purpose to disapprove of a particular religion, or of religion in general." Lukumi Babalu Aye, --- U.S. at ----, 113 S.Ct. at 2226 (emphasis added).
 
 
 38
 We point this out because if the regulations are not neutral and generally applicable, we need not address the Religious Freedom Restoration Act ("RFRA"). 42 U.S.C. Sec. 2000bb. Congress passed RFRA late in 1993 in response to a perceived change in constitutional doctrine by the Supreme Court. Congress was particularly concerned by the Supreme Court's decision in Smith, though the purported change in standards is illustrated by the holdings in both Smith and Lukumi Babalu Aye. Congress designed RFRA to force the Court to return to what Congress believed was the original constitutional standard. However, Smith and Lukumi Babalu Aye addressed purportedly neutral and generally applicable rules that resulted incidentally in a burden on an individual's practice of religion. The Supreme Court never intended Smith and Lukumi Babalu Aye to affect the methodology of dealing with those laws or rules that directly burden religion because they are not neutrally and generally applicable. Lukumi Babalu Aye, --- U.S. at ----, 113 S.Ct. at 2227 ("if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral ... and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest"). Here it is beyond peradventure that the Army regulations are not neutrally and generally applicable. Therefore, our task is to examine the issue as we would any other case involving laws or regulations that are not neutrally and generally applicable, and, as such, we need not address RFRA.III
 
 
 39
 While this case does not concern a "neutral and generally applicable" rule, Lukumi Babalu Aye remains instructive. "The principle that government may not enact laws that suppress religious belief or practice is so well understood that few violations are recorded in our opinions." Lukumi Babalu Aye, --- U.S. at ----, 113 S.Ct. at 2222. In fact, there are almost no cases in which an arm of the government has prohibited a religious practice because it was a religious practice. The majority of cases deal with at least ostensibly neutral laws. See, e.g., Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1879) (federal law banning polygamy upheld in face of challenge from Mormons); Lukumi Babalu Aye, --- U.S. at ----, 113 S.Ct. at 2217 (overturning law banning animal sacrifice because record disclosed that it was not genuinely neutral). Because the regulation at issue is not neutral and generally applicable, we use the standard described in Lukumi Babalu Aye. Specifically, "if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral ... and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." Lukumi Babalu Aye, --- U.S. at ----, 113 S.Ct. at 2227.[3] As such we must make two inquiries. First, is there a compelling interest to justify this rule, and second is it narrowly tailored to meet that interest.[4]
 
 
 40
 1. Is there a compelling state interest?
 
 
 41
 The Army argues that its compelling state interest is avoiding an unconstitutional entanglement with religion. Preventing entanglement with religion is a compelling state interest. Widmar v. Vincent, 454 U.S. 263, 271, 102 S.Ct. 269, 275, 70 L.Ed.2d 440 (1981). However, a claim of entanglement must be legitimate. A program that violates the Free Exercise Clause cannot be saved by relying on implausible Establishment Clause concerns. Therefore, the issue is whether the Army has raised a plausible, albeit hypothetical, claim or unconstitutional entanglement.
 
 
 42
 We review Establishment Clause claims under Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Government action will not contravene the Establishment Clause if: 1) it has a secular purpose; 2) its principal or primary effect neither advances nor inhibits religion; and 3) it does not foster an excessive government entanglement with religion.
 
 
 43
 The secular purpose test is an inquiry into whether the government's actual purpose is to endorse or disapprove of religion. Wallace v. Jaffree, 472 U.S. 38, 56, 105 S.Ct. 2479, 2489, 86 L.Ed.2d 29 (1985). There is solely a secular purpose to the regulations since the only concern is with regulating those who provide child care. It appears that the Army offers as a basis for its concern the latter two portions of the test. In particular, it seems to claim that its regulatory oversight would involve an extensive entanglement with religion, and that certain benefits, "subsidies" as it calls them, would involve both an advancement of religion and an entanglement with religion. That is, according to the Army "[t]he service members seek to have a religious day care provider trained, supervised, subsidized, and supplied with equipment by the government." These "subsidies" include the training classes, the provision of housing, USDA reimbursement for meals, the provision of insurance, and the use of a community toy box.
 
 
 44
 Part of this entanglement claim is illustrated by the Army's attempt to draw the Providers as close to the fold as possible. However, a review of the relationship between the Army and the Provider reveals that the relationship is solely one of regulator and regulatee. As such it is insufficient to create an unconstitutional entanglement with religion. Specifically, the Army pays Providers no salary, does not employ them, nor does it pay any fringe benefits to Providers. The Army regulations state that:
 
 
 45
 FCC providers are private contractors certified and monitored by the Army. As private contractors, all matters regarding establishment of fees, fee policies, and fee collection are between the provider and the parent. FCC personnel may give suggested fee ranges based on local circumstances, however this may only be a suggested range and may not be used to limit provider fees and charges.
 
 
 46
 AR 608-10 Sec. 6-5d.
 
 
 47
 The sample "Provider Statement of Understanding Regarding Family Child Care" contains similar statements. J.A. at 140. This document requires a provider to agree to, among other things, the following:
 
 
 48
 b. I further understand that FCC Providers are not government employees. As a FCC Provider, I will not have any contract with the U.S. Army to provide services to or in behalf of the U.S. Army. Any contracts that may exist will be between myself and individual families seeking care for their children. In this regard, I am an independent contractor.
 
 
 49
 c. As an independent contractor I will be legally responsible for my own actions, and primarily and individually liable for any injury or harm that may occur to children under my care as a result of any negligent or intentional act or omission on my part. Because, as a FCC Provider, I am not a government employee, the United States assumes no responsibility under the Federal Tort Claims Act, or any other provision of the law, which would allow it to be sued on account of my actions as an FCC provider.
 
 
 50
 The Army also requires parents to sign a "Parental Statement of Understanding Regarding Family Child Care." J.A. at 141. This document makes it clear to parents enrolling children at an FCC home that the Provider is not an employee. It states, among other things, the following:
 
 
 51
 b. I also understand that Army certified and provisionally-certified FCC providers are not Government employees acting within the scope of employment when performing child care activities under the provisions of Army regulation. Any contract, either oral or in writing that I make with a FCC Provider is a personal matter between myself and the FCC Provider concerned. The Government has no obligation to settle disputes between us on any issues regarding fees or other matters concerning the availability or quality of the child care services provided.
 
 
 52
 J.A. at 141 (emphasis added).
 
 
 53
 Similarly, while the Army now emphasizes the training it gives to Providers, it strikes a wholly different note when it discusses the matter with a parent seeking to use an FCC home.
 
 
 54
 c. I understand that each Army certified and provisionally-certified FCC provider receives some training before being allowed to provide child care and that a background check is performed on each FCC provider within existing resources and capabilities. Nevertheless, I understand that the United States assumes no responsibility under the Federal Tort Claims Act, or any other provision of the law, which would allow it to be sued on account of any act or omission--criminal, intentional, negligent, or otherwise--by a FCC Provider that causes and injury or death to a child placed under the care of that provider.
 
 
 55
 J.A. at 141 (emphasis added).
 
 
 56
 When viewed in light of how the Army presents its program in the regulations and to the participants, it is clear that the sudden attempt to cast FCC Providers as little more than the Army's alter egos exaggerates the relationship between the program and the individual Providers. The aspects of the program cited by the Army as supporting its entanglement claim fail to warrant such a conclusion. FCC Providers are private, independent contractors who set the terms of care with parents within the confines of the regulations.[5] These terms include the price of the service and the duration of care. Providers can take a single child, more than one child, or no children and can withdraw from the program at will. The very existence of an FCC home is dependent on the voluntary action of parents coming forward to participate in the program.
 
 
 57
 As a complement to its claim of an almost symbiotic relationship with these Providers, the Army argues that its regulatory scheme is so complex that subjecting religious Providers to it would be an entanglement with religion. This argument is implausible. It is, after all, the Army that has created the regulations. An agency of the government cannot create a Byzantine regulatory code and then ban religious practices because its regulatory code is so complex. The Army does not cite any case that holds that the mere fact that an activity is regulated creates an unconstitutional entanglement when that activity is partially religious. Governmental agencies routinely require safety inspections of church-owned property, require licensing of church-owned vehicles, and even grant liquor and restaurant licenses to church-affiliated colleges. In light of our modern regulatory state, it would simply be unworkable to conclude that mere regulation is a benefit to, or results in a sufficient entanglement with, religion as to merit constitutional concern. In fact, most of the cases dealing with government regulations have involved attempts by religious groups to gain special exemptions. See, e.g., Jimmy Swaggart Ministries v. Board of Equalization, 493 U.S. 378, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990) (no right to refuse to pay a state's general sales and use taxes); Bowen v. Roy, 476 U.S. 693, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986) (no free exercise right in refusing to use a Social Security number); United States v. Lee, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982)(Amish employer of Amish worker not exempt from compulsory participation in the Social Security system).
 
 
 58
 The Army certifies and monitors child care Providers and dictates the composition of meals provided and their play and rest periods. This no different from an imposition of certain safety requirements on parochial schools or religious day care facilities. See 45 CFR Sec. 98.54(b)(2) & 98.54(d)(allowing participation in a block grant program for sectarian day care facilities, but limiting expenditures from grants to nonsectarian purposes); 905 KAR 2:100 (Kentucky regulations governing Family Child Care homes). An extensive array of regulations does not then require (or even allow) a ban on religious activity to prevent entanglement. In fact, the Court has allowed the government to provide even more significant and tangible benefits. See Everson v. Board of Educ. of Ewing Township, 330 U.S. 1, 17-18, 67 S.Ct. 504, 512-13, 91 L.Ed. 711 (1947) (comparing the provision of free school bus services to parochial school students for safety purposes to the provision of fire and police services).
 
 
 59
 Ironically, it is the regulations as they now stand that put the Army at great risk of unconstitutionally entangling itself with religion. The regulations require the Army to determine exactly how much religion is too much, what is substantive about particular religions and what is merely educational, and when a Provider is using a religious symbol in a "proselytizing manner." AR 608-10, C-10, Compliance Item 9a(1) (standard requires "[Child Development Services] management oversight to ensure religion is not promoted or taught in CDS settings"); AR 608-10, C-10, Compliance Item 9(c) ("Equivalency. Questions/interpretations of current or proposed local practices should be referred to the installation staff judge advocate.") This involves a far greater risk of entanglement than allowing parents to set the terms of care in a private contract.
 
 
 60
 Neither the relationship between individual FCC Providers and the program, nor the fact that the program thoroughly regulates the actions of Providers in caring for children creates legitimate Establishment Clause concerns. A more serious and pressing concern is the argument that this program does not just regulate, it also provides benefits to participants. Traditionally, directly conferring benefits on religious groups or businesses has raised a whole host of Establishment Clause problems that have never been consistently addressed. See, e.g., Wallace v. Jaffree, 472 U.S. 38, 110, 105 S.Ct. 2479, 2517, 86 L.Ed.2d 29 (1985) (Rehnquist, J. dissenting) ("These difficulties arise because the Lemon test has no more grounding in the history of the First Amendment than does the wall theory upon which it rests.... The results from our school services cases show the difficulty we have encountered in making the Lemon test yield principled results."). However, an examination of the alleged benefits in this case leads us to conclude that they lack sufficient substance to warrant constitutional concern.
 
 
 61
 For example, the Army's claim that the regulations provide for a substantial amount of funding for the program is disingenuous. There is no evidence that this money goes to the FCC Provider, who is, as we have noted, an independent contractor. Instead it goes toward the administration of the program and toward other parts of the Army's comprehensive child care program. We do not doubt that a state may spend a great deal of money funding its Department of Motor Vehicles. We do not know of any case that has held that the state's expenditures are somehow imputed to a religious organization that seeks to register a car.
 
 
 62
 A further alleged benefit is the provision of housing. However, the purported entanglement caused by providing housing to servicemembers, whether as a form of compensation, as a rental, or for purchase, simply will not stand up to scrutiny. The resulting benefit, if any, from any religious practice in a house made available on standard terms is no different from a soldier donating a portion of his pay to a church. As Hartmann points out, the Supreme Court has held that aid for vocational rehabilitation assistance is valid even when used for religious training because this is the product of private choice. Witters v. Washington Dep't. of Serv. for the Blind, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986). Similarly, here the use made of a home provided as part of a soldier's compensation is the result of the soldier's private choice.[6] Any truly compelling subsidy concern would apply equally in cases where individuals provided religious care under the narrow exceptions to the regulations. See AR 608-10, C-2 Compliance Item 1b. Furthermore, the Court has permitted religious activity on what is unmistakably government property, allowing it in a home, though owned by the government, is far less likely to be construed as an endorsement. See, e.g., Capitol Square Review and Advisory Board v. Pinette, --- U.S. ----, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995); Americans United for Separation of Church and State v. City of Grand Rapids, 980 F.2d 1538 (6th Cir.1992) (en banc).
 
 
 63
 The Army alleges that the Provider can receive a certain cash reimbursement for meals that meet a USDA requirement. But the cash reimbursement does not come from the Army, it comes from the USDA. We do not think it is clear that the cash reimbursement is a violation of the First Amendment. Parochial schools are currently part of the federal school lunch program. See 42 U.S.C. Sec. 1760(c) ("In carrying out the provisions of this chapter, neither the Secretary nor the State shall impose any requirement with respect to teaching personnel, curriculum, instruction, methods of instruction, and materials of instruction in any school"); see also 42 U.S.C. Sec. 1760(d)(5). See generally New York Times, October 30, 1971, at 23 (USDA to purchase of 19 tons of kosher ground beef for distribution to Jewish parochial schools in New York City under National School Lunch program). We think the reimbursement is a matter between the USDA and the religious FCC Providers. If the USDA can justify excluding such Providers, that may be USDA's prerogative, but the possibility that a benefit will inure to the religious FCC homes from another government agency does not give the Army the license to ban religious child care.
 
 
 64
 The Army also claims that it provides a form of risk insurance to Providers. However, an examination of the regulations reveals that the insurance provided is not as broad as the Army would have us believe. Specifically, the insurance covers only certain limited claims. Furthermore, the Army makes it clear that "[i]t is not a substitute for private liability insurance. Whether to carry private liability insurance is an independent business decision to be made by the FCC provider." AR 608-10 Sec. 6-19e. The provision of such insurance may be little different from the provision of state risk pool protection or mandatory Social Security participation that may also provide a modest benefit, on an equal basis, to persons involved in religious work. Again, it is the Army regulation that has created the requirement. The Army cannot then use it as a pretext for banning religious practices.
 
 
 65
 Finally, the Army apparently allows Providers access to a community toy box. The Army lends these toys for fixed periods to Providers to aid in the care of children in their home. We think it is well settled that merely providing a benefit, by loan, of material, is not per se an advancement of religion. We conclude that the case most akin to this is Board of Educ. of Central Sch. Dist. No. 1 v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), in which the Supreme Court held that state loans of textbooks to parochial schools is constitutional. We conclude that access to the toy box is sufficiently analogous to warrant a similar conclusion.
 
 
 66
 2. Is this the Least Restrictive Means?
 
 
 67
 The Army does not seriously contend that the broad ban on religious practices in this case is the least restrictive means necessary to prevent an unconstitutional entanglement with religion. Even a cursory review of the record reveals numerous and ample ways, short of this ban, by which the Army could have prevented any purported entanglement. Thus, if the toy box and risk insurance were held to be truly critical, access to the toy box could be banned and the insurance could be removed or charged for. More importantly, since we find no threat of unconstitutional entanglement, the only avenue available to the Army is to allow full participation.
 
 IV
 
 68
 To counter the above conclusions, the Army seeks to play a final trump card. In a long line of cases, the Supreme Court has held that the "military is, by necessity, a specialized society separate from civilian society." Parker v. Levy, 417 U.S. 733, 743, 94 S.Ct. 2547, 2555, 41 L.Ed.2d 439 (1974).[7] The hallmark of this society is that it "must insist upon a respect for duty and a discipline without counterpart in civilian life." Schlesinger v. Councilman, 420 U.S. 738, 757, 95 S.Ct. 1300, 1313, 43 L.Ed.2d 591 (1975). See also Burns v. Wilson, 346 U.S. 137, 140, 73 S.Ct. 1045, 1047, 97 L.Ed. 1508 (1953); Brown v. Glines, 444 U.S. 348, 357 n. 14, 100 S.Ct. 594, 601 n. 14, 62 L.Ed.2d 540 (1980).
 
 
 69
 The soldier's special status means that to "protect our treasured liberties, the military must be able to command service members to sacrifice a great many of the freedoms they enjoyed in the civilian community and to endure certain limitations of the freedoms they retain." Goldman v. Weinberger, 475 U.S. 503, 515, 106 S.Ct. 1310, 1317, 89 L.Ed.2d 478 (1986). The Supreme Court noted has that:
 
 
 70
 Our review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society. The military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment; to accomplish its mission the military must foster instinctive obedience, unity, commitment and esprit de corps.
 
 
 71
 ...
 
 
 72
 * * *
 
 
 73
 [Therefore] when evaluating whether military needs justify a particular restriction on religiously motivated conduct, courts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest.
 
 
 74
 Goldman, 475 U.S. at 506-07, 106 S.Ct. at 1312-13.
 
 
 75
 The court has consistently deferred: Goldman v. Weinberger, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (military need not let soldier wear a yarmulke; result reversed by statute, see 10 U.S.C. Sec. 774 (1988)); Chappell v. Wallace, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (members of the military cannot bring Bivens type action against officers); Brown v. Glines, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980) (Air Force regulation curtailing the right to circulate petitions is constitutional); Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (prohibition of political speeches and protests constitutional); Schlesinger v. Councilman, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975) (right of federal courts to review actions military conviction limited in scope); Parker v. Levy, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (conviction of officer who urged resistance to orders sustained); Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953) (scope of review of military habeas petitions is narrower than in the civilian context).
 
 
 76
 Clearly the courts must grant the military wide latitude in its operations. Nonetheless, some First Amendment protection still exists. "These aspects of military life do not, of course render entirely nugatory in the military context the guarantees of the First Amendment." Goldman, 475 U.S. at 507, 106 S.Ct. at 1313. See also Chappell, 462 U.S. at 304, 103 S.Ct. at 2368 (noting that " 'our citizens in uniform may not be stripped of basic rights simply because they have doffed their civilian clothes,' " quoting Earl Warren, The Bill of Rights and the Military, 37 N.Y.U.L.Rev. 181, 188 (1962)). The issue then is whether in light of the traditional deference granted to the military by the courts they have nonetheless managed to cross the line separating the constitutional from the unconstitutional. We think they have.
 
 
 77
 The military exists to preserve the security of the United States, and in doing so it protects the freedoms of the citizenry. It does so by ensuring that it is prepared to do what armed forces have done throughout recorded history, make war on the enemy. This function has required courts to defer to Army judgment on many aspects of internal operations, including the proper scope of uniformity, discipline and morale. The military can force soldiers to wear certain clothes, subject them to a different system of justice, and use equipment that is not only lethal to those on the business end, but far more dangerous to the user than would be tolerated in a civilian context. All of these factors are, either directly or indirectly, crucial to the military's central mission of effective combat. Clearly the wearing of a yarmulke has little to do with battlefield competence. Nonetheless, the military considers the maintenance of uniformity and the discipline it engenders to be a necessary ingredient of its preparedness, and the courts do not look any further.
 
 
 78
 Here, however, the Army has wandered far afield. It stands not in an area where the link to its combat mission is clear, it does not even stand in an area where the link is attenuated but nonetheless discernable. Instead, the link here is far more ephemeral than those found in other cases. First, and most important, it does not necessarily involve the conduct of a member of the armed forces. Instead, in setting the terms of child care for its members, it controls the conduct of people not in the Armed Forces, including spouses and children. Second, those religiously offensive regulations to which the Court has deferred appear to have always been, on their face, neutral and generally applicable. For example, in Goldman the regulation did not ban yarmulkes, it banned the wearing of headgear indoors. Here the regulation contains an explicit ban on certain religious practices occurring in private. For instance, the regulation does not prohibit the keeping of livestock and poultry in a private home, which incidentally interferes with a religion that engages in the ritual sacrifice of animals. Instead the regulation unequivocally states that thou shall not pray. Similarly, while the issues are base related, since the care takes place in on-base housing, the homes are functionally private. Finally, related to the first factor is the traditional notion that parents can best determine the scope of child care. That is, not only does the military regulation govern non-military parties, it governs non-military parties in an area traditionally reserved for, and uniquely suited to, parental authority. See, e.g., Pierce v. Society of Sisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925) (referring to a state law requiring school age children to attend public schools only, the Court noted that "we think it entirely plain that the Act ... unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control.... The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.").
 
 
 79
 Naturally, to the extent that the FCC program truly plays a part in military readiness, it may be that some individual preferences would have to give way. At oral argument, though not supported in the record, counsel for the Army argued that operational necessity (e.g. a massive troop deployment to a foreign country) might require the military to place dependent children in any available child care slot, which might be with a family whose religious practice would not be compatible with the family leaving the child. As the program is now structured, there appears to be no ban at the present time on a Provider refusing to take a child for any reason, so this alleged difficulty could not be met in any event, as the record now stands. However, in such an extreme instance, military necessity might well justify an exception in the program for such circumstances. In fact, at oral argument, plaintiffs indicated that they would have no objection to such an exception.
 
 
 80
 That is not now the issue. What the Army has banned is the conduct of the daily home life of a willing family, taking care of children willingly entrusted to them. The many homely (literally) rituals that make up our daily life are the subject of the ban, and result in a significant interference with the chosen family life of both the Provider and the child. Apparently the mother or father can read aloud about King Lear, but not King David; can have the children wash hands before meals if it is for hygienic reasons, but not if the traditional Jewish prayer is said beforehand, as it might have been in the child's own home; can begin the meal with the Pledge of Allegiance ("one Nation under God"[8]), but not with a recognition of the food being under God. In homes where candles are traditionally lit on Friday night, presumably they can still be lit for illumination, but not if the millennia-old prayer is said at the same time.
 
 
 81
 It would be an extraordinary and unprecedented expansion of governmental (and military) authority to allow the direct and unequivocal regulation, and even prohibition, of private acts of religious conscience and practice by non-members of the military in their homes under the guise of regulating day-care. The Establishment Clause obviously does not require so much, and the Army thus cannot have the compelling interest required under the Free Exercise Clause to enforce such rules, nor does the Army have any remotely possible argument of military necessity for the general enforcement of such rules.
 
 V
 
 82
 The judgment of the district court is REVERSED. The matter is REMANDED to the district court for proceedings consistent with this opinion.
 
 
 83
 WELLFORD, Circuit Judge, concurring.
 
 
 84
 I concur in the resolution of the issues discussed in parts I, II, and III of this opinion. The First Amendment does not mandate a freedom from religion, nor does it prohibit "the free exercise thereof."
 
 
 85
 I write with respect to the discussion in part IV of the opinion, which deals with deference to the military and its decisionmaking, particularly its concern about "establishment of religion."
 
 
 86
 The purposes of the First Amendment guarantees relating to religion were twofold: to foreclose state interference with the practice of religious faiths, and to foreclose the establishment of a state religion familiar in other 18th-century systems.... Some limited and incidental entanglement between church and state authority is inevitable in a complex modern society....
 
 
 87
 Larkin v. Grendel's Den, Inc., 459 U.S. 116, 122-23, 103 S.Ct. 505, 510, 74 L.Ed.2d 297 (1982).
 
 
 88
 We must determine whether the military's interest, as set out in its regulations program at issue, in avoiding religious entanglement or establishment of religion is of the "highest order," and whether the regulations least intrusively impinge upon the "free exercise of religion." Wisconsin v. Yoder, 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972) ("The essence of all that has been said and written on the subject is that only those interests of the highest order ... can overbalance legitimate claims to the free exercise of religion."); accord Thomas v. Review Bd., 450 U.S. 707, 717, 101 S.Ct. 1425, 1431-32, 67 L.Ed.2d 624 (1981).
 
 
 89
 The Supreme Court has given special consideration and deference in the First Amendment context to regulations which relate to discipline and uniformity in military matters. See, e.g., Goldman v. Weinberger, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986); Chappell v. Wallace, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); Brown v. Glines, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980). These cases, however, apply to regulations that directly govern military personnel and their actions. Goldman involved a freedom of religion challenge to military dress code regulations by a chaplain during peacetime in respect to "necessary habits of discipline and unity." Goldman, 475 U.S. at 508, 106 S.Ct. at 1313. In addition, the military may insist on information from its prospective officer inductees despite the individual's conscientious objection to taking loyalty oaths. Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953).
 
 
 90
 These cases, and others cited by the Secretary, give special deference to the military in mandating certain code, conduct, and service that have a direct relation to military discipline, uniform, and authority. In my view, the regulations in controversy have not been demonstrated to have any direct relationship to these particular military requirements and concerns. For instance, a workman in an essential defense industry was not required by the Supreme Court to conform his religious beliefs in connection with production of military goods. See Thomas v. Review Bd., 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). In that case, there was only an indirect relationship to military requirements; this connection with the military in production of needed military equipment was not a military interest "of the highest order" that deserved preference over free exercise of religion.
 
 
 91
 I am of the view that the military's interest in enforcement of the family child care program regulations is not of the highest order. Participation in the challenged program is not mandated by the Army, but is "entirely voluntary." Secretary's Brief at 17. Additionally, the program does not directly pertain to the uniformity and discipline of soldiers. While there may be an incidental benefit to military families and their religious beliefs, the military has not created any special incentive for a student to take a religious or sectarian course, and the program is generally available without regard to the sectarian/nonsectarian nature of the particular child care provided. Thus, I see no violation of the Establishment Clause. See Zobrest v. Catalina Foothills Sch. Dist., --- U.S. ----, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993).
 
 
 92
 I agree with the majority that there is no compelling Army or state interest, under the circumstances, in precluding entirely any religious aspect of the child care program and its conduct by the independent contractor providers. See Witters v. Washington Dept. of Servs. for the Blind, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986). Our court has recently held, in a related context, that a city ordinance authorizing lease of a small space at the city's airport terminal to the Catholic Diocese to accommodate religious needs of travelers did not constitute endorsement of religion. Hawley v. City of Cleveland, 24 F.3d 814 (6th Cir.1994). Granting plaintiffs the relief they seek does not constitute endorsement of, or entanglement with, religion and its free exercise.
 
 
 93
 I concur in this court's reversal of the district court, accordingly, despite our recognition of the special consideration given military regulations.
 
 
 
 [1]
 We presume the reference to "Bible" stories is only illustrative and that the regulation would equally prohibit "religious stories" from the Talmud, Koran, or Bhagavad-Gita. The "religious" status of, e.g., D'Aulaire's Greek Myths or Ovid's Metamorphoses is unclear. See also Mozert v. Hawkins County Bd. of Educ., 827 F.2d 1058, 1081 n.13 (Boggs, J., concurring) (referring to religious stories in a basic educational reader and noting that 47 had religious origins of some sort, though only three were Christian); Paul Vitz, Religion and Traditional Values in Public School Textbooks, 84 Public Interest 79 (1986)
 
 
 [2]
 We note that after objections to the Magistrate Judge's report were filed, the matter was returned to him for further findings. In his second report, he retreated from this position. Instead, the final opinion adopted by the district court relied largely on the deference owed to the military
 
 
 [3]
 Both parties argue at length that the regulation must impose a substantial burden on the exercise of religion by Hartmann. Apparently they rely on the tests described in cases such as Wisconsin v. Yoder, 406 U.S. 205, 215-16, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972). This reliance is misplaced. The test in Yoder and other similar cases are designed to judge those situations in which a neutral and generally applicable regulation imposes an indirect, albeit substantial, burden on the practice of religion. See, e.g., Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Thomas v. Review Bd. of Indiana Employment Sec. Div., 450 U.S. 707, 717-18, 101 S.Ct. 1425, 1431-32, 67 L.Ed.2d 624 (1981)
 
 
 [4]
 As noted, the Hartmanns need not demonstrate a substantial burden on the practice of their religion. However, they must demonstrate a sufficient interest in the case to meet the normal requirement of constitutional standing. There is no doubt they have done so. The regulation is so broad that it not only restricts the ability of the Hartmanns to involve children (either their own when left with a provider, or children in their care) in activities with religious content, it also restricts the Hartmanns' practice of their own religion. Furthermore, the Hartmanns claim that their religion requires that their children be raised in a religious environment. They have maintained that they hold this belief throughout this action, the Army has not disputed it and it was a finding of the district court. We find no error in the conclusion that the Hartmanns believe that it is inappropriate for their child to receive care outside of a Christian environment. See, e.g., Proverbs 22:6 (King James) ("Train up a child in the way he should go: and when he is old, he will not depart from it.")
 
 
 [5]
 The regulations make it clear that programs can include other types of special interest houses, so long as they are not religious. See, e.g., Army Regulation 608-10, Sec. 6-9(a)(3)(d) [at J.A. 127] ("(d) Bilingual/bicultural homes. Care for children where parents have a preference for a particular language or cultural focus."). Thus, a care provider could emphasize Hebrew or Latin, as long as she was careful not to use the language for prayer. This raises grave free speech concerns, particularly in light of the Supreme Court's recent opinion in Rosenberger v. Rector and Visitors of the Univ. of Va., --- U.S. ----, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)
 
 
 [6]
 We do not think that Army contends that the use of a home by a "religious" FCC provider somehow devalues the government's investment, since such a theory would apply to all FCC homes
 
 
 [7]
 Though not significant in this case, it has never been clear exactly where in a free exercise analysis this portion of the test must fit. Some have characterized it as replacing the "compelling state interest" portion, but we think it stands as a separate option open to the military to justify its regulation. Therefore, once we conclude that the regulation would fail the normal constitutional test we still must determine whether, in the face of what is normally a constitutional violation, the court must defer to military judgment
 
 
 [8]
 36 U.S.C. Sec. 172