Justice Thomas,
dissenting.
Through the program at issue in this case — a program named, ironically, for Father Joseph Sellinger, a Roman Catholic priest— the State of Maryland provides financial aid, on a per student basis, to a wide range of private colleges. Although many of the colleges participating in the Sellinger Program are affiliated with religious institutions, Maryland deemed Columbia Union College, a private liberal arts college affiliated with the Seventh-day Adventist Church, “too religious” to participate. 159 F. 3d 151, 154-155 (CA4 1998). Throughout this litigation, Columbia Union College has maintained that Maryland violated its free speech, free exercise, and equal protection rights by excluding it from the Sellinger Program. The District Court and the Court of Appeals for the Fourth Circuit agreed that the State’s action infringed one or more of these rights. But, relying on our decision in Roemer v. Board of Public Works of Md., 426 U. S. 736 (1976) (plurality opinion), both courts nonetheless concluded that Columbia Union’s exclusion could be justified by Maryland’s compelling interest in enforcing the Establishment Clause by ensuring that a “pervasively sectarian” institution did not benefit from public funds.
We invented the “pervasively sectarian” test as a way to distinguish between schools that carefully segregate religious and secular activities and schools that consider then* religious and educational missions indivisible and therefore require religion to permeate all activities. In my view, the “pervasively sectarian” *1014 test rests upon two assumptions that cannot be squared with our more recent jurisprudence. The first of these assumptions is that the Establishment Clause prohibits government funds from ever benefiting, either directly or indirectly, “religious” activities. See id., at 755. The other is that any institution that takes religion seriously cannot be trusted to observe this prohibition.[1]
We no longer require institutions and organizations to renounce their religious missions as a condition of participating in public programs. Instead, we have held that they may benefit from public assistance that is made available based upon neutral, secular criteria. See Agostini v. Felton, 521 U. S. 203 (1997) (students attending religious schools eligible for federal remedial assistance); Rosenberger v. Rector and Visitors of Univ. of Va., 515 U. S. 819 (1995) (Christian student organization eligible for student activity funds); Zobrest v. Catalina Foothills School Dist., 509 U. S. 1 (1993) (publicly funded sign language interpreter could assist student in a Catholic school); Witters v. Washington Dept. of Servs. for Blind, 474 U. S. 481 (1986) (blind student free to use public vocational assistance to attend bible college). Furthermore, the application of the “pervasively sectarian” test in this and similar cases directly collides with our decisions that have prohibited governments from discriminating in the distribution of public benefits based upon religious status or sincerity. See Rosenberger, supra (invalidating university policy denying student activity funds to Christian student newspaper); Lamb's Chapel v. Center Moriches Union Free School Dist., 508 U. S. 384 (1993) (invalidating “religious use” restriction on public access to school district property); Widmar v. Vincent, 454 U. S. 263 (1981) (invalidating policy prohibiting student religious organizations from using public university’s facilities).
We should take this opportunity to scrap the “pervasively sectarian” test and reaffirm that the Constitution requires, at a minimum, neutrality not hostility toward religion. See Bowen v. Kendrick, 487 U. S. 589, 624-625 (1988) (Kennedy, J., joined by Scalia, J., concurring). By so doing, we would vindicate Columbia Union’s right to be free from invidious religious diserimination. *1015 [2] Columbia Union’s exclusion from the Sellinger Program “raise[s] the inevitable inference that the disadvantage imposed is born of animosity to the class of [institutions] affected,” namely, those schools that insist upon integrating their religious and secular functions. Romer v. Evans, 517 U. S. 620, 634 (1996); see also Church cf Lukumi Babalu Aye, Inc. v. Hialeah, 508 U. S. 520, 547 (1993) (“[U]pon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures”). We also would provide the lower courts — which are struggling to reconcile our conflicting First Amendment pronouncements — with much needed guidance. Compare Peter v. Wedl, 155 F. 3d 992 (CA8 1998) (holding that the First Amendment prohibits school district from denying special education services to a child solely because he attends a religious school), and Hartmann v. Stone, 68 F. 3d 973 (CA6 1995) (invalidating policy excluding religious day care centers from Army program), with Strout v. Albanese, 178 F. 3d 57 (CA1 1999) (upholding state law excluding students who attend religious schools from education tuition program), and Bagley v. Raymond School Dept., 1999 ME 60, 728 A. 2d 127 (1999) (same).
Although the Court declines to grant certiorari today — perhaps because this ease comes to us in an interlocutory posture — the growing confusion among the lower courts illustrates that we cannot long avoid addressing the important issues that it presents.

 Typical of this assumption is the plurality’s statement in Tilton v. Richardson, 403 U. S. 672, 681 (1971), that “[t]here is no evidence that religion seeps into the use of any of these facilities!!;] • • . the schools were characterized by an atmosphere of academic freedom rather than religious indoctrination.”

 Indeed, Maryland is not the only State that practices religious discrimination in the distribution of financial aid. See, e.g., Colo. Rev. Stat. §23-3.5-101-106 (1998) (students attending pervasively sectarian colleges ineligible for Colorado Student Incentive Grant Program); Wash. Rev. Code § 28B.10.814 (1994) (students pursuing a theology degree ineligible for state financial aid programs); Wis. Stat. Ann. §39.30(2)(d) (Supp. 1998-1999) (state tuition grants shall not be awarded to “members of religious orders who are pursuing a course of study leading to a degree in theology, divinity or religious education”).