**Michael RADER, Individually and as Father and Next Friend of Douglas Rader, Plaintiff,**

v.

**Gladys Styles JOHNSTON, Dean Bresciani, Barbara Hancock Snyder, and Douglas R. Wermedal, in their official capacities, Defendants.**

No. 4:CV95–3282.

United States District Court, D. Nebraska.

April 5, 1996.

Jefferson Downing, Keating, O'Gara Law Firm, Lincoln, NE, for plaintiffs.

John C. Wiltse, Richard R. Wood, Lincoln, NE, for defendant.

## MEMORANDUM OF DECISION

PIESTER, United States Magistrate Judge.

In this action Douglas Rader, an eighteen-year-old freshman student at the University of Nebraska–Kearney ("UNK"), alleges that UNK's parietal rule, which requires on-campus residency of freshman students, runs afoul of the First Amendment to the United States Constitution. The bench trial of this matter having been concluded, I now issue my findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).[1] For the reasons stated more fully below I shall enter judgment for the plaintiff, Douglas Rader.

## FINDINGS OF FACT

UNK's parietal rule requires all full-time freshman students at UNK to live on campus during their first year of college. (Exh. 1). UNK administrators believe that the parietal rule fosters diversity, promotes tolerance, increases the level of academic achievement, and improves the graduation rate of its students. The policy also ensures full occupancy of UNK residence halls. Douglas Rader, a devout Christian, seeks an injunction prohibiting UNK administrators from enforcing the freshman housing policy against him on the ground that it violates his right to free exercise of religion under the First Amendment to the United States Constitution.[2] Specifically, he claims that his Christian lifestyle would be disrupted if he were forced to live in a UNK dormitory; instead, he would prefer to live in the Christian Student Fellowship ("CSF") house, a nearby housing facility inhabited by other students with similar beliefs. Rader also requests this court to declare the parietal rule unconstitutional on its face and as construed and applied towards him.[3]

█ UNK's parietal rule states as follows:

1. The parties consented to have me preside at trial and enter judgment pursuant to 28 U.S.C. § 636(c). (See filing 10).

2. Douglas Rader also brought this action under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb. In filing 37, I granted summary judgment against Rader on his RFRA claim, because he had failed to submit evidence establishing that the free exercise of his religion had been substantially burdened by the policy. As I also noted in filing 37, however, the dismissal of the RFRA claim did not dispose of Rader's claim under the United States Constitution itself, because, under some circumstances, if a law is not neutral and of general applicability, a plaintiff is not required to prove that his or her free exercise of religion has been "substantially burdened." *Hartmann v. Stone,* 68 F.3d 973, 978 (6th Cir.1995); *Brown v. Borough of Mahaffey, Pa.,* 35 F.3d 846, 849–50 (3rd Cir.1994). *See Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 533–34, 113 S.Ct. 2217, 2227, 124 L.Ed.2d 472 (1993). Since a genuine issue of material fact remained for decision, summary judgment was inappropriate on the constitutional claim. *Greeno v. Little Blue Valley Sewer Dist.,* 995 F.2d

861, 863 (8th Cir.1993). The complaint also alleged that the parental rights of Douglas' father, Michael Rader, in controlling the education of his son had been violated. *See e.g. Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) and *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). However, as I noted in filing 37, this claim was later abandoned.

3. Rader originally brought this action against the Board of Regents of the University of Nebraska, the corporate governmental body which operates UNK; however, the parties stipulated at trial that the Board of Regents be dismissed and the following UNK administrators be added as defendants to this action: Gladys Styles Johnston, Chancellor of UNK; Barbara Hancock Snyder, Vice–Chancellor for Student Affairs at UNK; Dean Bresciani, Director of Residence Life at UNK; and Douglas R. Wermedal, Assistant Director of Residence Life at UNK. The defendants are all state actors.

Due to an agreement between the parties, Douglas Rader has resided off-campus in the CSF facility since August of 1995 without any adverse action being taken against him by UNK.

[T]he University of Nebraska at Kearney requires all full-time freshmen to live on-campus their freshman year. Established exceptions to the policy are only: (a) the freshman student will be living with his/her parents or legal guardians and commuting from within the local Kearney community, (b) the freshman student is 19 years old or older on the first class day of fall semester, or (c) the freshman student is married. All freshmen [sic] students not living on-campus are required to submit a Petition for Exception to the Freshman Housing Policy. (Exh. 1).[4] If a freshman student meets one of the foregoing criteria, he or she is not required to live on campus during his or her freshman year. Further exceptions are granted on an ad hoc basis at the discretion of UNK administrators. If a freshman student fails to sign a valid housing contract without obtaining an exception to the policy, UNK may suspend the student's course registration, grades, and other University services provided to him or her. (Exh. 1). Of approximately 2,500 full-time freshmen attending classes at UNK, 1,600 of those students reside on campus; the remaining 900 freshmen live off campus.

### Rader's Religious Beliefs and Christian Student Fellowship

Douglas Rader is an eighteen-year-old freshman student at UNK. Rader was raised by his parents in a distinctly religious environment and is a member of the Christian Church of Trumbull, Nebraska. Rader and his family believe that the Bible is the Word of God; it instructs them how to live their daily lives and entreats them to make decisions which they believe glorify God.[5] Rader and his family believe that there is no area of their lives that is outside the influence of their faith. Rader's beliefs require him to abstain from smoking, premarital sex, the consumption of alcohol or drugs, and the use of profanity.

During his senior year of high school Douglas Rader considered attending several postsecondary schools upon graduation. However, he chose to attend UNK because, unlike many of the smaller private schools he considered, it offered a four-year agribusiness program, superior quality agribusiness courses, and recruited him to play for the men's varsity basketball team. Rader knew that he would be subject to UNK's parietal rule before applying for admission.

After his acceptance into the University, Douglas Rader petitioned UNK for an exception to the policy on the ground that his religious convictions exhort him to live in an environment that encourages "moral excellence during [his] college career." (Exhibit 1). In his petition Rader stated,

> Although I am appreciative of the housing offered at UNK, I do respectfully request that I be allowed the choice to live in alternate housing at Christian Student Fellowship. I have been raised in a distinctly religious home, founded solidly upon Christian principles. The Christian Student Fellowship is an organization our church has sponsored and my family has supported for many years.

Rader detailed the behavior he believed occurs in UNK residence halls:

> I have heard from many of my classmates and friends of the wild lifestyles allowed in

---

The defendants testified, however, that UNK will enforce the parietal rule against Rader in the event he is unsuccessful in this case. As a decision on the merits has been reached before the end of the spring semester and Douglas Rader would have been subject to the freshman housing policy if judgment were entered against him, this case is not moot and a justiciable controversy exists under Article III, § 2. *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1049 (9th Cir.1983) (a stipulation between parties does not moot a claim if the agreement is to endure only during the pendency of litigation). In addition, since the enforcement measures are not limited to the freshman year, it appears this dispute will not be mooted by the plaintiff's completion of his freshman year, nor by his reaching the age of nineteen.

4. The parties have stipulated that the parietal rule is not enforced at other branches of the University of Nebraska in the same fashion as it is at UNK.

5. For example, during his years in high school Rader's family met at 7:00 o'clock each morning for a family devotion to read scripture, discuss issues in their lives, seek solutions to their problems based upon the Bible, and pray for guidance in meeting the challenges of the day.

the dormitories at UNK.... The obnoxious alcohol parties in the dormitories, the immoral atmosphere, and the intolerance towards those who profess to be Christians would severely hinder my free exercise of religion and be a definite hardship for me.

Rader wrote, "I want to live a daily life which reflects high moral standards—those standards which my parents and my church have instilled in me. Living in the residence halls would make that impossible." (Exhibit 1). Therefore, Rader requested that UNK allow him to live with other students of similar faith in the Christian Student Fellowship ("CSF") facility, across the street from the UNK campus.

CSF is a "non-denominational Christian ministry geared to the students of the University of Nebraska at Kearney." (Exh. 121). The purpose of the organization is to "foster the Lordship of Christ on the UNK campus." (Exh. 121). CSF operates a three-story residential facility for UNK students who wish to share "a lifestyle which glorifies Christ." (Exh. 121). The facility offers residents regular fellowship activities, weekly Bible studies, counseling, prayer support, and leadership and evangelism training. (Exh. 121). Although a student does not have to be a member of a particular denomination to reside at CSF, virtually all students who live in the facility are Christians who profess beliefs similar to those of Douglas Rader.

The facility, established in 1974, is located within a hundred feet of the south edge of the UNK campus, across the street from the University's Health and Sports Center. The CSF facility is actually closer in proximity to the heart of the UNK campus than many of the University's residence halls. (Exhibit 33). During the spring and fall semesters the facility typically houses twenty-two students, which is the maximum number of resi-

dents allowed to reside in the building.[6] The students reside on the top two floors of the building and are segregated according to sex. A kitchen, meeting room, Christian library, and administrative offices are located on the first floor of the facility.

CSF employs a full-time campus minister, Greg Swinney, to oversee the program. Swinney provides counseling for the students and coordinates religious activities for the facility. Additionally, two "floor shepherds" reside at the facility and are responsible for addressing the needs of residents. Potential residents must complete an application expressing their reasons for desiring to live at CSF before they may live in the facility. (*See e.g.* Exhs. 34 and 35). Residents agree to keep the doors of their rooms open while entertaining guests of the opposite sex and agree to abstain from the use of alcohol, drugs, tobacco, and profanity. A major violation of the facility's rules will result in expulsion from the residence; however, such action has never been necessary. In fact, Swinney testified that during his twelve years at the facility there had never been a violation of the alcohol policy.

In contrast, the lifestyles of many, if not most, students who live in UNK residence halls are markedly different from those of the students who live at CSF. Even though the University prohibits the possession and consumption of alcohol on its campus, between four and eight violations of the alcohol policy occur each week, and administrators recognize that the actual number of students who consume alcohol on campus is much higher, despite their best efforts to control the problem.[7] A 1995 survey conducted by Reach–Up, a program funded by the University to address student alcohol and drug abuse, reported that seventy-eight percent of UNK students consumed alcohol within the thirty days prior to responding to the survey, and a substantial number of UNK students

---

6. Students from several foreign countries, including Australia, Jamaica, Kenya, Columbia, and Japan, have lived at CSF at various times. The CSF ministry also involves approximately 150 to 175 other UNK students who do not live in the facility.

7. The actual number of students who possess and consume alcohol in the residence halls is sub-

stantially higher than the number of violations reported. For instance, while investigating damage caused by a fire in a residence hall, Douglas Wermedal, Assistant Director of Residence Life for UNK, testified that he found evidence of alcohol consumption in almost all of the rooms he inspected.

use illegal drugs, such as marijuana, amphetamines, and hallucinogens.[8] Over half of the UNK residence halls have twenty-four hour visitation policies, which allow visits by members of the opposite sex in a student's dormitory room at any hour, and all residence halls have condoms available in vending machines located in bathrooms within the facilities. The University allows smoking on designated floors and does not regulate the use of profanity or "off-color" joking in the residence halls. Rader considers all of these activities to be sinful and objects to being exposed to them. However, nothing within the residence halls would prohibit Douglas Rader from praying, worshipping, reading his bible, or engaging in other similar religious activities at any time he desired.

Michael Rader, Douglas's father, compared his son's request to live at CSF with the example he believes was set by Jesus Christ. According to his interpretation of the Bible, during the day Christ associated with "sinners", but in the evening he returned to live among his apostles and disciples.

Douglas Rader associates with other UNK students daily in his classes, at basketball practice, and at his part-time job with UNK's Health and Sports Center; however, Douglas believes that CSF is vital to his spiritual growth because it allows him to live in fellowship with other Christians. In addition, Rader does not wish to live in the dormitories

because he believes he must "run away ... from temptation" and remain "free from sin." He summarized his desire to live at CSF as a way to "strengthen [his] walk with the Lord."

### Exceptions to UNK's Parietal Rule

As noted above, the freshman housing policy itself provides three instances where freshman students are granted exceptions to the parietal rule: (1) if the student is nineteen years or older on the first class day of the fall semester; (2) if the student is married; or (3) if the student lives with his or her parents or legal guardians and is commuting from within the local Kearney community.[9] (Exh. 1). Students who fall within one of these enumerated exceptions are automatically granted an exception to the policy upon submission of a petition for exception.[10]

UNK also grants exceptions to the parietal rule for additional reasons not enumerated within the policy. These exceptions are granted for various reasons under the rubric of "significant and truly exceptional circumstances which would make living on-campus impossible...." (Exh. 1). However, in practice, exceptions have been granted in a variety of circumstances that cannot fairly be said to "make living on-campus impossible." While UNK administrators have granted exceptions in cases of serious medical need and single parent pregnancies,[11] they have also

---

8. In 1995, seventy-three percent of students under the age of twenty-one, the legal drinking age in Nebraska, had consumed alcohol. (Exh. 22). Additionally, fifty-one percent of UNK students had engaged in binge drinking (consuming 5 or more drinks in one sitting) within two weeks of responding to the survey. Sixty-five percent of UNK students had engaged in some form of misconduct, such as becoming involved in a fight, having an encounter with a law enforcement officer, receiving a citation for driving under the influence of alcohol, or taking sexual advantage of another person, during the past year as a result of drinking or using drugs. (Exh. 22).

The study reported use of the following products by UNK students during the previous year and compares that data with students on a nation-wide basis:

|          | 1993 | 1994 | 1995 | Nationally |
|----------|------|------|------|------------|
| Alcohol  | 93%  | 92%  | 93%  | 92%        |
| Tobacco  | 62%  | 58%  | 26%  | 58%        |
| Marijuana| 30%  | 25%  | 26%  | 45%        |
| Amphetamines | 20% | 14% | 16% | 14% |
| Hallucinogens | 7% | 3% | 5% | 10% |

(Exh. 22).

9. UNK administrators have defined the local Kearney community as constituting a twenty-mile radius around the campus.

10. It is worth noting that only freshmen under nineteen years of age fall within the terms of the policy; thus, if a sophomore student were still under the age of nineteen at the start of the fall term, he or she would not be subject to the parietal rule. In addition, neither older freshmen nor part-time freshmen are subject to the rule.

11. While UNK operates a separate facility, University Heights, that houses only students with families, and this complex is considered "on-campus" housing by UNK, the defendant administrators grant freshman parents exceptions to the policy instead of requiring them to live at University Heights.

granted exceptions to the following petitioners: a student, living outside the "Kearney community," who wished to drive his pregnant sister to classes at UNK; a student who was depressed and experienced headaches; a student with learning disabilities; a student who was mourning the death of a parent and a close friend; a student who wished to help care for her great-grandmother; and a student who was a non-custodial parent entitled to visitation with his son on alternating weekends.[12] (Exhs. 41–56).

In addition, UNK has granted so-called administrative exceptions to the parietal rule for reasons that are not articulated in the information it publishes about its policy and that may not be stretched to fit a stated exception to the rule. For example, a student living in Colorado requested an exception to the policy in order to live with a relative in Kearney during the 1994–1995 academic year. (Exh. 55). The student, whose parents were alumni of UNK, threatened to attend the University of Colorado instead of UNK if she were not granted an exception to the policy. (Ex. 55). After her petition for exception was rejected by lower level administrators, the student's parents contacted a family friend who was a member of the board of the UNK Foundation, the organization responsible for raising donations from UNK alumni. Thereafter, UNK reversed its position and granted the student an "administrative" exception to the policy. (Ex. 55). In a similar case the defendant administrators refused to grant an exception to a student who wished to live with his parents and commute from Overton, Nebraska. (Exh. 56). After the student's parents complained about the denial of his petition to Nebraska State Senator Jim Cudaback, UNK reversed its position and granted the exception.[13] (Exh. 56). When all of the exceptions to the freshman housing policy— published, unenumerated, or created at the discretion of administrators—are taken into account, only 1,600 of the 2,500 freshmen attending UNK are required by the University to comply with the parietal rule.[14]

12. Although UNK's freshman housing policy purports to require documentation from a student's parents in support of a petition for exception, UNK administrators have granted many requests without such support. Administrators even granted two exceptions upon petitions consisting of one or two sentences and offering no other documentation or support. For example, a petition dated June 26, 1995 states: "I am 18 years old and a sgl. [sic] parent. I will be living at [address omitted] next year." (Exh. 51). A petition dated May 9, 1993 states, "I am living with my parents in Bertrand and I am mother of a 7 month old baby [sic]." (Exh. 49). The UNK administration did not conduct any independent investigation into the truthfulness or seriousness of these circumstances before granting the exceptions. (Exhs. 47, 49, 50, 51, 52).

13. In yet another case UNK administrators granted the student who wished to drive his pregnant sister to classes at UNK an exception to the policy during the fall semester of 1993, but, because the student's sister delivered her child in the fall of 1993, the administrators required the student to live on campus during the following spring semester. (Exh. 47). After the student's mother complained to a member of the Board of Regents of the University of Nebraska, however, the defendants reversed their prior decision and granted the student an "administrative" exception to the parietal rule for the spring semester. (Exh. 47).

14. UNK has a total enrollment of approximately 10,000 students, 8,000 of whom attend classes on a full-time basis. Approximately 2,500 of the full-time students are freshmen. UNK residence halls have a total capacity of 2,600 students. The residence halls currently operate at roughly ninety percent of their total capacity. Of the students who live on campus, 800 are upperclassmen. Therefore, from the testimony given at trial, approximately 900 full-time freshman students live off campus.

Although at one point Defendant Bresciani's testimony indicated that UNK received only between 114 and 168 total petitions for exception each year for the 1993, 1994, and 1995 academics years, his suggestion was obviously in error because the memorandum he refereed to as the basis of this testimony indicates that the referenced number of petitions received were for exceptions made "beyond those stated in the policy for full-time students." (Exh. 112). Thus, the petitions for exception summarized in Exhibit 112 do not include petitions submitted for reasons stated within the terms of the policy, namely marriage, living with parents in the Kearney community, and age. (See Exh. 1).

Moreover, the number of petitions referenced in Exhibit 112 is far below the number of freshmen who do not live on the Kearney campus. Simple arithmetic dictates that if UNK residence halls have a total capacity of 2,600 students, and if the resident halls are operating at ninety percent capacity, about 2,400 students currently live in them. If 800 upperclassmen live in the dormitories, then, at most, 1,600 freshmen live in the dormitories. This number coincides with the

### Application of the Parietal Rule to Douglas Rader

Douglas Rader's request for an exemption to the policy on religious grounds was reviewed by Defendant Douglas Wermedal, Assistant Director of Residence Life at UNK. Wermedal denied Rader's petition for exception by a letter dated April 7, 1995. Following the denial of his petition Rader received a letter from Defendant Bresciani, Director of Residence Life at UNK, threatening to drop Rader from classes at UNK unless he signed a housing contract to live in a residence hall. (Exh. 32).

Although Defendant Wermedal testified at trial that petitions for exception to the policy on religious grounds should be considered on an individual basis, in the case of Douglas Rader, he denied the exception without contacting Rader, his parents, or CSF officials and without otherwise conducting an independent investigation into the circumstances of the petition.[15] Rather, Wermedal, who is also a Baptist minister, determined that Rader's petition should be denied on the basis of his own "personal experience," knowledge of life in UNK residence halls, and "religious expertise." He found that Rader's belief that living in the residence halls would be hostile to his faith was "simply not true" and that there was nothing within the residence halls that would hinder Rader's practice of religion. When asked the extent to which his personal experiences as a Baptist minister affected his decision, Wermedal indicated that he relied upon his own understanding of religious beliefs to a significant degree in rejecting Rader's petition. Wermedal also noted that the purpose of the policy was to foster diversity and promote tolerance among UNK students, as well as to support academic achievement and retention of students between their freshman and sophomore years.[16] At trial each of Wermedal's superiors, Defendants Johnston, Snyder, and Bresciani, supported Wermedal's denial of Rader's petition.

Prior to Barbara Hancock Snyder's arrival as Vice–Chancellor for Student Affairs in 1991, exceptions for freshmen who wished to reside at CSF were freely granted by the UNK administration. However, after 1991, every petition for exception submitted to UNK by freshman students requesting permission to reside at CSF has been denied. In October of 1994 several CSF officials met with Snyder and other UNK administrators regarding UNK's practice of denying petitions for exceptions to live at CSF. Following the meeting a University of Nebraska Regent contacted Snyder with his concerns about UNK's enforcement of the policy. Snyder refused to change the manner in which the policy was enforced or to designate CSF as "on-campus" housing, but did offer to house students with beliefs similar to those

number of freshmen, 1,600, that Defendant Bresciani stated lived on campus at another point in his testimony. As approximately 2,500 full-time freshmen attend classes at UNK, it is evident that at least 900 full-time freshman students do not live in the residence halls. As there was no evidence of the number of part-time freshman students at UNK, the number of freshmen who do not live on campus is likely to be significantly higher than 900.

Incidentally, the great majority of the petitions for exception denied by UNK, which are referenced in Exhibit 112, were submitted for financial reasons only. That is, the students wished to live off campus only because they believed they would save money by doing so. These cases are not considered to fit any of recognized exception to the rule.

**15.** In cases where an exception was requested on medical grounds Wermedal conducted an independent investigation into the circumstances in every case before denying the petitions, and he occasionally conducted such an investigation before granting a petition on medical grounds. Rader's petition was four paragraphs in length and was supported by a letter from his father, Michael Rader. (Exh. 1). Rader did not appeal the denial of his petition; however, UNK did not instruct Rader that an avenue for appeal was available to him. Moreover, Wermedal's superiors testified that such an appeal would have been denied.

Two other assistant directors of Residence Life, in addition to Wermedal, make initial decisions whether to grant or deny petitions for exception. Although Wermedal has not encountered another petition for exception on religious grounds, it is clear that the other two assistant directors and their predecessors have received petitions for exceptions on religious grounds.

**16.** However, a 1992–1993 manual published by UNK Residence Life states that the purpose of the housing policy is to ensure full occupancy of the residence halls. Other UNK officials conceded that financial considerations were among the reasons behind the parietal rule.

who wished to live at CSF in adjoining rooms or a designated wing of a residence hall.

At trial Defendant Snyder indicated that UNK will not voluntarily grant exceptions to its policy for freshman students who want to live at CSF. Snyder believes that CSF does not meet UNK's goals of fostering academic success and diversity and that life in the residence halls would not have an adverse effect on the religious beliefs of any UNK student. She has never visited the facility, however, and does not have any independent basis such as studies or statistical information to verify her beliefs.[17]

Snyder's superior, Defendant Gladys Styles Johnston, Chancellor of UNK, stated that Rader's petition does not meet the University's standard of extenuating circumstances. Although Johnston considers it sound to grant exceptions to the policy for medical conditions, she believes that exceptions should not be granted in cases of spiritual hardship. Defendant Johnston testified that students who do not wish to live in the residence halls for religious reasons should not attend UNK.

## CONCLUSIONS OF LAW

■ The First Amendment, which is applicable to the States by incorporation into the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const., Amdt. 1; *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). Although the Free Exercise Clause continues to prohibit all "government regulation of religious beliefs" themselves,[18] *Sherbert v. Verner*, 374 U.S. 398, 402, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963), the United States Supreme Court's ruling in *Employment Division v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), has significantly diminished constitutional protection for conduct mandated by an individual's religious beliefs.

■ In *Smith*, two individuals, who had been disqualified from receiving state unemployment compensation benefits for engaging in job related misconduct concerning the ingestion of peyote during Native American Church religious ceremonies, challenged the denial of benefits to which they believed they were entitled by the State of Oregon. A majority of the Court held that "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes ... conduct that his religion prescribes...."[19] 494 U.S.

---

**17.** The University cites a compilation of studies, entitled "How College Affects Students" by Earnest T. Pascarella and Patrick T. Terenizi, in support of its argument that on-campus residency during the freshman year promotes academic success and fosters diversity. A portion of the work, which was quoted by Defendant Bresciani in a memorandum dated August 15, 1995 to Defendant Snyder, states, "[R]esidential living is positively, if modestly linked to ... a liberalizing of social, political, and religious values and attitudes...." (Exh. 11). In addition, the study indicates that living in the residential halls increases the likelihood that a student will exhibit no religious preference by the time he or she is a senior in college. Pascarella and Terenizi, *How College Affects Students*, 314 (1980). In contrast, living at home decreased the likelihood that a student would experience a shift in religious preference. The study found this tendency to hold true even when a wide variety of beliefs and practices were controlled. *Id.* The study concludes that the most reasonable explanation for its findings were that students living at home are not only reinforced in the religious value system of parents and siblings, but they are also "insu-

lated from any of the potentially challenging effects of close and continuing associations with other students whose religious values may be quite different." *Id.* at 315.

**18.** The Supreme Court first distinguished protection for religious beliefs from protection for conduct motivated by those beliefs in *Cantwell v. State of Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

Thus the [First] Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society. The freedom to act must have appropriate definition to preserve the enforcement of that protection. In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom.

*Id.* at 303, 60 S.Ct. at 903.

**19.** Justice Scalia wrote the opinion for the majority, which was joined by four other justices. Justice O'Connor wrote a separate concurrence

872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (internal citations and quotations omitted). Thus, while religious beliefs remain absolutely protected from government intrusion, the performance of or forbearance from an act that is otherwise prohibited or required by an individual's religious beliefs may be regulated by government officials so long as the law is not specifically aimed at impeding religious conduct. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 531, 113 S.Ct. 2217, 2226, 124 L.Ed.2d 472 (1993); *Smith,* 494 U.S. at 877–78, 110 S.Ct. at 1599–1600. In short, under the Supreme Court's current jurisprudence, there is no "private right to ignore generally applicable laws" whether or not those laws burden the exercise of religion. *Smith,* 494 U.S. at 886, 110 S.Ct. at 1604. "[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law had the incidental effect of burdening a particular religious practice." *Lukumi Babalu Aye,* 508 U.S. at 531, 113 S.Ct. at 2226.

■ Despite its broad terms, the *Smith* rule, however, is not all encompassing. Although the right of free exercise does not

relieve an individual of the obligation to comply with a neutral, generally applicable law, the Free Exercise Clause still "forbids subtle departures from neutrality" and "covert suppression of religious beliefs." *Lukumi Babalu Aye,* 508 U.S. at 533, 113 S.Ct. at 2227 (quoting *Gillette v. United States,* 401 U.S. 437, 452, 91 S.Ct. 828, 837–38, 28 L.Ed.2d 168 (1971) and *Bowen v. Roy,* 476 U.S. 693, 706, 106 S.Ct. 2147, 2155–56, 90 L.Ed.2d 735 (1986) (plurality opinion)). The First Amendment prohibits discrimination by government officials "against some or all religious beliefs . . . ." *Lukumi Babalu Aye,* 508 U.S. at 531, 113 S.Ct. at 2226 (citing *Braunfeld v. Brown,* 366 U.S. 599, 607, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563 (1961) (plurality opinion). Thus, if a law is not neutral or of general applicability, the government may justify its infringement upon the particular religious practice only by demonstrating that the infringement is narrowly tailored to further a compelling governmental interest.[20] *Id.* Therefore, in this case, if UNK's parietal rule is not neutral or not generally applicable, and enforcement of the rule against Rader does not further a compelling state interest not otherwise served, Rader will prevail.[21]

criticizing the majority's abdication of the compelling interest test; however, she believed that the government's interest in regulating use of peyote was sufficiently compelling to justify denial of unemployment benefits in that instance. 494 U.S. at 891, 110 S.Ct. at 1606–07. (O'Connor, J., concurring in judgment). Justices Brennan, Marshall, and Blackmun joined the portion of O'Connor's opinion urging continued use of the compelling interest test in free exercise cases, but those justices disagreed with Justice O'Connor's conclusion that the denial of benefits in that case was justified by a compelling governmental interest. 494 U.S. at 907, 110 S.Ct. at 1615 (Blackmun, J., dissenting).

Although the majority opinion in *Smith* has been harshly criticized by virtually every legal scholar and commentator addressing the decision, *see e.g.* Michael W. McConnell, *Free Exercise Revisionism and the Smith Decision,* 57 U.Chi.L.Rev. 1109 (1990), and various members of the Court have demanded reconsideration of the *Smith* holding at the first opportunity, *see Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 558–78 and 578–80, 113 S.Ct. 2217, 2240–50 and 2250–51, 124 L.Ed.2d 472 (Souter, J., concurring) and (Blackmun and O'Connor, J., concurring) (1993), there is no question that the *Smith* decision is valid, binding precedent at this time.

20. Although the Supreme Court assumed that few government officials would be so naive as to enforce or enact policies so as to burden religious observers specifically, *see e.g. Smith,* 494 U.S. at 894, 110 S.Ct. at 1608, several courts have since found that government officials tried to enforce policies that were not neutral or generally applicable. *See Hartmann v. Stone,* 68 F.3d 973 (6th Cir.1995); *Brown v. Borough of Mahaffey,* 35 F.3d 846 (3rd Cir.1994); *Church of Scientology v. City of Clearwater,* 2 F.3d 1514 (11th Cir.1993), *reh'g denied,* 12 F.3d 221 (1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 54, 130 L.Ed.2d 13 (1994); *United States v. Boyll,* 774 F.Supp. 1333 (D.N.M.1991); *First Covenant Church of Seattle v. City of Seattle,* 120 Wash.2d 203, 840 P.2d 174 (1992).

21. An additional exception to the *Smith* rule also exists. In *Smith* Justice Scalia also observed, "The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press . . . ." 494 U.S. at 881, 110 S.Ct. at 1601. Hence, several federal courts, including the Court of Appeals for the Eighth Circuit, have recognized so-called hybrid-rights claims, where

*Lukumi Babalu Aye*, 508 U.S. at 544–45, 113 S.Ct. at 2233.

### First Amendment Requirements for Constitutionality

In *Lukumi Babalu Aye*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), the Supreme Court invalidated a city's ordinances prohibiting the slaughter of certain types of animals within the limits of the city. The Court found that the ordinances were neither neutral nor generally applicable, because they were designed solely to suppress the practice of ritual animal sacrifice by adherents to the Santeria religion in the community. *Id.* at 540–42, 113 S.Ct. at 2231. While the Court did not provide a detailed explanation of the difference between the two requirements, it noted that the two requirements are interrelated: "[F]ailure to satisfy one requirement is a likely indication that the other has not been satisfied." *Id.* at 531–33, 113 S.Ct. at 2226. The Court also indicated that strict scrutiny will be triggered if a law or governmental policy fails to meet either requirement. *Lukumi Babalu Aye*, 508 U.S. at 531–33 and 544–46, 113 S.Ct. at 2226 and 2233.[22] The neutrality and general applicability requirements as applied to this case are discussed in turn more fully below.

### (1) General Applicability

■ Because the city's ordinances in *Lukumi Babalu Aye* fell "well below the minimum standard necessary to protect First Amendment rights[,]" the Court declined to "define with precision the standard used to evaluate whether a prohibition is of general applicability." *Id.* at 543, 113 S.Ct. at 2232. At a minimum, however, the Court stated, "[G]overnment, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Id.* "[C]ategories of selection are of paramount concern when a law has the incidental effect of burdening religious practice. The Free Exercise Clause 'protect[s] religious observers against unequal treatment.'" *Id.* (quoting *Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 148, 107 S.Ct. 1046, 1053, 94 L.Ed.2d 190 (1987) (Stevens, J., concurring in judgment)).

In the case at bar only approximately 1,600 of the 2,500 freshmen attending UNK are required by the University to comply with its parietal rule. Put another way, over one third of freshman students are excused from it. The policy itself provides three instances where freshmen are routinely granted exceptions to the rule. (Exh. 1). Students whose parents live within twenty miles of the UNK campus, students who are married, and students who are over nineteen years of age at the beginning of the fall semester are granted automatic exceptions from the parietal rule upon submission of a petition for exception. (Exh. 1). In addition, part-time freshmen and students under the age of nineteen who are upperclassmen are not subject to the parietal rule. (Exh. 1).

■ The Court also stated in *Lukumi Babalu Aye* and in *Smith* that "in circumstances in which individualized exemptions

---

an individual may bolster his or her Free Exercise claim by demonstrating the violation of another fundamental constitutional right. *Brown v. Hot, Sexy and Safer Productions*, 68 F.3d 525 (1st Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 1044, 134 L.Ed.2d 191 (1996); *Cornerstone Bible Church*, 948 F.2d 464, 473 (8th Cir.1991); *American Friends Service Comm. v. Thornburgh*, 961 F.2d 1405, 1407–08 (9th Cir.1991). *But see Kissinger v. Board of Trustees*, 5 F.3d 177 (6th Cir. 1993) (refusing to recognize hybrid-rights claims until further clarification of the issue by the Supreme Court). If an individual is successful in doing so, strict scrutiny apparently applies. *See Smith*, 494 U.S. at 876–77, 110 S.Ct. at 1598–99 (citing past Court decisions that purportedly involved hybrid-rights claims). However, as Michael Rader's parental rights claim has been abandoned, Douglas Rader's free-exercise claim may not be coupled to it. *See e.g. Wisconsin v.* *Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (cited in *Smith* as constituting a free-exercise/parental-rights hybrid). In addition, though the facts of this case may implicate the First Amendment right of association, violation of such a right was not pleaded in the complaint or addressed at trial. Thus, Rader may not avail himself of this exception to the *Smith* rule.

22. Justice Kennedy, writing for the Court, stated, "[O]ur cases establish the general proposition that a law that is neutral *and* of general applicability need not be justified by a compelling governmental interest...." *Id.* at 531, 113 S.Ct. at 2226 (emphasis added). "A law burdening religious practice that is not neutral *or* not of general applicability must undergo the most rigorous scrutiny." *Id.* at 546, 113 S.Ct. at 2233 (emphasis added).

from a general requirement are available, the government 'may not refuse to extend that system to cases of 'religious hardship' without compelling reason.' "[23] *Lukumi Babalu Aye,* 508 U.S. 520, 537, 113 S.Ct. 2217, 2229 (1993) (quoting *Bowen v. Roy,* 476 U.S. 693, 708, 106 S.Ct. 2147, 2156–57, 90 L.Ed.2d 735 (1986) (plurality opinion)).[24] In this case UNK administrators grant exceptions to the policy, at their discretion, in a broad range of circumstances not enumerated in the rule and not well defined or limited. While de-

fendants grant petitions for exceptions to the parietal rule in circumstances such as medical need and single parent pregnancies that would likely impose a harsh burden on the petitioner, they also grant exceptions in a variety of other less onerous circumstances, such as for a student who wished to drive his pregnant sister to classes at UNK, a student who wished to help care for her great-grandmother, and a student who was a non-custodial parent entitled to visitation with his son on alternating weekends. (Exhs. 41–56).

23. For example, in *Smith,* Justice Scalia, writing for the Court, cited *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Thomas v. Review Board of Indiana Employ. Sec. Div.,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), as standing for the proposition that when government grants exemptions to a general rule on an individualized basis and refuses to extend an exemption to a religious observer, strict scrutiny applies. *Smith,* 494 U.S. 872, 884, 110 S.Ct. 1595, 1603, 108 L.Ed.2d 876 (1990). Justice Scalia noted that unemployment compensation programs typically use eligibility criteria, such as the "good cause" standard, which consider "the particular circumstances behind the applicant's unemployment." *Id.* Hence, in *Sherbert* and *Thomas,* the government was required to justify its denial of unemployment benefits for cases of "religious hardship" by demonstrating that it had a compelling interest for doing so. The justices who disagreed with Scalia's interpretation would apply strict scrutiny in every case; thus, they would necessarily apply strict scrutiny in cases of individualized exemptions. 508 U.S. at 558–80, 113 S.Ct. at 2240–52.

Although one district court has refused to consider individualized exemptions outside the area of unemployment compensation, *Jane L. v. Bangerter,* 794 F.Supp. 1537, 1547 n. 10 (D.Utah 1992), courts and commentators generally agree that a pattern of individualized exemptions undercuts applicability of the broad rule in *Smith* in other contexts as well. *See Kissinger v. Board of Trustees,* 5 F.3d 177, 179 (6th Cir.1993); *Am. Friends Service Comm. v. Thornburgh,* 961 F.2d 1405, 1408 (9th Cir.1992); *Vandiver v. Hardin County Bd. of Educ.,* 925 F.2d 927, 933–34 (6th Cir.1991); *United States v. Phila. Yearly Meeting of Religious Soc.,* 753 F.Supp. 1300, 1304 (E.D.Pa.1990); *First Covenant Church of Seattle v. City of Seattle,* 120 Wash.2d 203, 840 P.2d 174, 181 (1992); Simon J. Santiago, *Zoning and Religion: Will the Religious Freedom Restoration Act of 1993 Shift the Line Toward Religious Liberty?,* 45 Am.U.L.Rev. 199 (1995); Thomas J. Cunningham, *Considering Religion As A Factor In Foster Care in the Aftermath of Employment Div. v. Smith,* 28 U.Rich.L.Rev. 53 (1994); Brydon DeWitt, *Partially Disabled and Religious: Virginia Worker's Compensation and the Free Exercise Clause,* 28 U.Rich.L.Rev. 763 (1994); Comment,

*Employment Division v. Smith: The Supreme Court Improves the State of Free Exercise Doctrine,* 12 St. Louis U.Pub.L.Rev. 569 (1993). In addition, the Supreme Court's latest free exercise decision, *Lukumi Babalu Aye,* removes much of the doubt about the role of individualized exemptions outside the unemployment compensation context. 508 U.S. at 536–38, 113 S.Ct. at 2229 (relying in part on individualized exemptions to invalidate ordinances pertaining to ritual animal sacrifice). Whether individualized exemptions constitute an exception to the *Smith* rule or merely preclude a finding of general applicability, see note 24, *infra,* I see no justifiable basis for limiting consideration of them to only those cases involving unemployment compensation.

24. Some courts have treated this language, which first appeared in *Smith,* as creating an exception to *Smith* for cases involving "individualized exemptions." *See e.g. Vandiver v. Hardin County Bd. of Educ.,* 925 F.2d 927, 932–33 (6th Cir.1991). If this language does indeed create an exception, beyond the broader general applicability inquiry, it is likely that a plaintiff denied an exemption would be required to prove that his or her exercise of religion had been substantially burdened thereby. Although the Supreme Court phrased the issue in terms of "religious hardship" in *Smith,* 494 U.S. at 884, 110 S.Ct. at 1603, the unemployment cases from which the individualized exemptions exception was derived required that the religious observer establish that his or her religion had been substantially burdened by a state's regulatory framework. *Hobbie v. Unemployment Appeals Comm'n of Fla.,* 480 U.S. 136, 141, 107 S.Ct. 1046, 1049, 94 L.Ed.2d 190 (1987); *Thomas,* 450 U.S. 707, 717–18, 101 S.Ct. 1425, 1431–32, 67 L.Ed.2d 624 (1981); *Sherbert,* 374 U.S. at 400, 403–06, 83 S.Ct. at 1791–92, 1793–95 (1963).

In this case, however, because I find that UNK's parietal rule is not generally applicable, I need not inquire further as to whether the plaintiff's evidence at trial established a "substantial" burden. I have considered UNK's system of individualized exemptions as only one of several factors in the generally applicable inquiry. I have not considered the system of individualized exemptions as an exception to the *Smith* rule.

The defendants also grant so-called administrative exceptions in cases where no justifiable reason exists under the stated purposes of the policy. The defendants, however, refuse to extend exceptions to students, such as Douglas Rader, who wish to live at CSF. As noted above, in order to meet the general applicability requirement, at a minimum "government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Lukumi Babalu Aye*, 508 U.S. at 543, 113 S.Ct. at 2232. In this case UNK has selectively refused to confer benefits— exceptions to the policy—upon religious observers who wish to live at CSF.

In summary, although exceptions are granted by the defendants for a variety of non-religious reasons, they are not granted for religious reasons. Over one third of the freshman students at UNK are not required to comply with the parietal rule. The defendants in this case have created a system of "individualized government assessment" of the students' requests for exemptions, but have refused to extend exceptions to freshmen who wish to live at CSF for religious reasons. Accordingly, I conclude the parietal rule cannot be viewed as generally applicable to all freshman students. *Smith*, 494 U.S. 872, 884, 110 S.Ct. 1595, 1603, 108 L.Ed.2d 876 (1990); *Lukumi Babalu Aye*, 508 U.S. at 536–38 and 542, 113 S.Ct. at 2229 and 2232 ("The Free Exercise Clause 'protect[s] religious observers against unequal treatment.'") (quoting *Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 148, 107 S.Ct. 1046, 1053, 94 L.Ed.2d 190 (1987) (Stevens, J., concurring in judgment)). I turn next to the First Amendment's requirement of neutrality.

#### (2) Neutrality

"[T]he minimum requirement of neutrality is that a law not discriminate on its face." *Lukumi Babalu Aye*, 508 U.S. at 533, 113 S.Ct. at 2227. A finding of mere facial neutrality, however, does not end the inquiry. To pass constitutional muster a governmental law or policy must also be neutral in purpose and effect. *Id.* at 531–32, 113 S.Ct. at 2226. Thus, in *Lukumi Babalu Aye*, the Court did not end its analysis of the city's ordinances after finding that they were facially neutral. Rather, the Court traced the adoption of the ordinances to the Santerias' announcement that they planned to conduct rituals in a building within the city and determined that the ordinances prohibited virtually no other types of animal slaughter except those used by the religious sect. *Id.* at 533–42, 113 S.Ct. at 2227–31. The Court therefore concluded that the ordinances were not neutral in their purpose and effect. "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Id.* at 532, 113 S.Ct. at 2226 (citing *Braunfeld v. Brown*, 366 U.S. 599, 607, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563 (1961) (plurality opinion).[25] Like the Establishment Clause, the Free Exercise Clause "forbids subtle departures from neutrality" and "covert suppression of religious beliefs." *Lukumi Babalu Aye*, 508 U.S. at 534, 113 S.Ct. at 2227 (quoting *Gillette v. United States*, 401 U.S. 437, 452, 91 S.Ct. 828, 837–38, 28 L.Ed.2d 168 (1971) and *Bowen v. Roy*, 476 U.S. 693, 706, 106 S.Ct. 2147, 2155–56, 90 L.Ed.2d 735 (1986) (plurality opinion)). In this case I conclude that the defendants engaged in such a departure.

Defendant Wermedal, who is also a Baptist minister, denied Rader's petition for exception on the ground that he was "firmly persuaded that there is nothing in the residence hall environment which would prohibit the free exercise of [Rader's], or any other per-

**25.** Although Justice Kennedy equated the neutrality requirement to an equal protection analysis, which requires an examination of the legislative purpose of the law or policy, only Justice Stevens joined in that section of Kennedy's opinion (Section II–A–2). *Id.* at 520, 113 S.Ct. at 2220. Justices Scalia and Rehnquist believe that courts should not attempt to determine the purposes of the legislature or policy-making body in enacting a rule of decision but should confine their analysis to objective factors, such as the effect of the law or policy. *Id.* at 556–60, 113 S.Ct. at 2239–2240. Justices Souter, Blackmun, and O'Connor would require strict scrutiny in every case. *Id.* at 558–80, 113 S.Ct. at 2240–52. Every justice agreed that the ordinances at issue in *Hialeah* were unconstitutional.

sons['], faith." (Exh. 2). However, Wermedal did so without conducting any investigation into the circumstances of the petition as was his ordinary custom before denying requests for exemptions. He did not speak with either Douglas Rader or Michael Rader. He did not visit CSF or speak with any of its members or clergy. He did not investigate the suitability of CSF as University-approved housing, and he did not compare the graduation or attrition rates of its residents with those of the general student population.

Instead, Defendant Wermedal testified that he denied Rader's request based on his own "personal experience," knowledge of life in UNK residence halls, and "religious expertise." Wermedal indicated that his personal experiences as a Baptist minister affected his decision to reject Rader's petition to a significant extent. Though I am certain that Defendant Wermedal did not intend to discriminate against Rader on the basis of his faith, he treated Rader's petition differently from those of persons requesting exceptions based on non-religious grounds by simply rejecting it out of hand. Although in cases of pregnancies and medical need Defendant Wermedal had granted exceptions without validating the petitioners' assertions, (Exhs. 47, 49, 50, 51, 52), in the case of Douglas Rader, Defendant Wermedal summarily rejected Rader's assertions as "simply not true" without verifying that this presumption was correct. He judged Rader's petition in terms of his own religious experiences and tested the validity of Rader's beliefs against those of his own faith.

The testimony of Wermedal's superiors, particularly Defendants Johnston and Snyder, manifested a degree of antipathy toward members of CSF.[26] In addition to adopting

a practice of denying exemptions to CSF students, Defendant Snyder refused to modify her enforcement of the policy after meeting with CSF officials and being contacted by a member of the Board of Regents. She did, however, offer to house CSF students together in a residential area reserved for them. Snyder believes that CSF does not meet UNK's goals behind enactment of the parietal rule, despite the fact that she has never visited the facility. Moreover, Defendant Snyder's testimony indicated that UNK would not grant an exception to a freshman student who wanted to live at CSF under any circumstances.

Defendant Johnston, Chancellor of UNK, indicated that petitions for exception to the policy based on religious grounds do not meet the University's standard of extenuating circumstances and should not be granted. While Johnston considers it sound to grant exceptions to the policy for medical conditions, pregnancies, students living with relatives, students over the age of nineteen on the first day of the fall semester, and apparently even in cases of the "administrative" exceptions where no valid reason for requesting the exception is required, she believes that exceptions should not be granted in cases of spiritual hardship. In her opinion students who do not wish to live in the residence halls for religious reasons should not attend UNK.

"The Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Id.* at 534, 113 S.Ct. at 2227. While the policy as written is certainly neutral on its face and in its purpose (insofar as a purpose can be identified), when administrators refuse to consider an

---

26. For example, at one point, while Snyder was testifying that the parietal rule should be enforced to promote diversity of thought among students, she stated, referring to Douglas Rader, his family, and other members of CSF present in the courtroom, "I would differ with those in the room. Diversity of thought is positive." At another point, when asked whether a study indicated that Douglas Rader would be more likely to experience no decline in religious preference if he were allowed to live at CSF, Snyder replied, "that's an assumption that you would make" and "that's your interpretation of the study." Later her testimony proceeded as follows:

Q. Would you agree that UNK is a campus that has a mixture of Christian and non-Christian students?
A. Yes.
Q. That the residence hall environment would be mixed between Christian and non-Christian students?
A. I'm assuming I understand *your* definition of the word *Christian*, but yes, I agree with that.
(Testimony of Barbara Hancock Snyder) (emphasis in quotation reflects emphasis in speech pattern).

entire class of individuals, freshman students who desire to live at CSF based upon their faith, for exceptions to a policy that some thirty-six percent of freshman students routinely receive, I am unable to conclude that the rule is being enforced in a neutral manner.[27] If a law or policy "provides exemptions for certain reasons, such as medical treatment, then it should provide similar exemptions for religious purposes, unless the state can show an overriding compelling interest." Thomas J. Cunningham, *Considering Religion As A Factor In Foster Care in the Aftermath of Employment Division v. Smith*, 28 U.Rich.L.Rev. 53 (1994).

Moreover, a policy is not enforced in a neutral manner when administrators base decisions upon their own religious experiences and their own perceptions of the religious beliefs of others. *Cantwell v. Connecticut*, 310 U.S. 296, 305, 60 S.Ct. 900, 904, 84 L.Ed. 1213 (1940). "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs...." *Lukumi Babalu Aye*, 508 U.S. at 532, 113 S.Ct. at 2226. State actors may not without justification refuse to extend exceptions that they routinely grant to persons for non-religious reasons to those requesting the same exception based on sincerely held religious beliefs. *Id.; see also United States v. Boyll*, 774 F.Supp. 1333, 1341 (D.N.M.1991) (holding that under *Smith*

government may not grant exemptions to a law for some religious observers while withholding them from others). *Cf. McDaniel v. Paty*, 435 U.S. 618, 622, 98 S.Ct. 1322, 1325–26, 55 L.Ed.2d 593 (1978) (invalidating a Tennessee statute that disqualified ministers from serving as legislators). I therefore conclude that the defendants have not enforced the parietal rule in a neutral manner against Douglas Rader.

Because UNK's parietal rule is not generally applicable and has not been applied in a neutral manner, Rader need not demonstrate that the burden on his religion is substantial. *Id.* at 544–46, 113 S.Ct. at 2233; *Hartmann v. Stone*, 68 F.3d 973, 979 n. 4 (6th Cir.1995); *Brown v. Borough of Mahaffey*, 35 F.3d 846, 849 (3rd Cir.1994); *Church of Scientology v. City of Clearwater*, 2 F.3d 1514, 1543 (11th Cir.1993), *reh'g denied*, 12 F.3d 221 (1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 54, 130 L.Ed.2d 13 (1994).[28] He must demonstrate only "a sufficient interest in the case to meet the normal requirement of constitutional standing." *Hartmann*, 68 F.3d at 979 n. 4. There is no question that the standing requirement has been met in this case, because the defendants refuse to grant him an exception to the parietal rule. The defendants therefore may justify their action only by demonstrating that denying Rader an exception to the policy serves a

---

**27.** "Neutrality and general applicability are interrelated, and ... failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Id.* at 531, 113 S.Ct. at 2226.

**28.** A panel of the Fourth Circuit Court of Appeals concluded in *Goodall by Goodall v. Stafford County School Bd.*, 60 F.3d 168 (4th Cir.1995), that the free exercise of a hearing impaired student's religion was not substantially burdened under RFRA by having to attend a public school in order to receive a cued speech translator at public expense. The panel then disposed of the student's First Amendment claim that the policy was not generally applicable, because the court had already found that the student had failed to demonstrate a substantial burden on the exercise of his religion. *Id.* at 173.

I decline to adopt the panel's approach in *Goodall*, because it is clearly contrary to the Supreme Court's approach in *Lukumi Babalu Aye*. In *Lukumi Babalu Aye*, the Court did not consider whether the ordinances posed a sub-

stantial burden on the exercise of the Santerias' religion, but proceeded directly to the compelling interest test after it determined that the ordinances were not neutral or generally applicable. 508 U.S. at 544–46, 113 S.Ct. at 2233. It is likely that the Fourth Circuit panel did not recognize the issue as it merely cited the *Smith* decision and did not cite *Lukumi Babalu Aye* or any other authority when it declined to conduct a general applicability analysis, and it summarily disposed of the plaintiff's claim in two scant sentences. 60 F.3d at 173. Rather, I agree with the Third Circuit's conclusion that applying "a burden test to non-neutral government actions would make petty harassment of religious institutions and exercise immune from the protection of the First Amendment." *Brown v. Borough of Mahaffey*, 35 F.3d 846, 849–50 (3rd Cir.1994). Therefore, like the Third, Sixth, and Eleventh Circuits, I conclude that the burden requirement is appropriate only in cases where government officials acted in a neutral, generally applicable manner with respect to religious observers. *Id.* at 850.

compelling state interest. *Lukumi Babalu Aye*, 508 U.S. at 531–33, 113 S.Ct. at 2226.

### Compelling Interest Test

"A law burdening religious practice that is not neutral or not of general applicability must undergo the most rigorous scrutiny." *Lukumi Babalu Aye*, 508 U.S. at 546, 113 S.Ct. at 2233. In such cases the government must justify its burden upon the particular religious practice by demonstrating that its actions are narrowly tailored to further a compelling governmental interest. *Lukumi Babalu Aye*, 508 U.S. at 531–33, 113 S.Ct. at 2226. "Only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Wisconsin v. Yoder*, 406 U.S. 205, 212, 216, 92 S.Ct. 1526, 1531–32, 1533, 32 L.Ed.2d 15 (1972).

■ The defendants identify four purposes behind UNK's freshman policy. First, the policy itself states that "students who live in the residence halls their freshman year ultimately do better academically [and] have higher graduation rates...." (Exh. 1). Second, the defendants maintain that the policy fosters diversity, and third, promotes tolerance among UNK students. Fourth, during cross-examination the administrators also conceded that, in part, the policy ensures full occupancy of UNK's residence halls. As discussed below, I conclude that although these interests are certainly legitimate, *see Prostrollo v. Univ. of South Dakota*, 507 F.2d 775 (8th Cir.1974), *cert. denied*, 421 U.S. 952, 95 S.Ct. 1687, 44 L.Ed.2d 106 (1975),[29] they do not rise to the level of "interests of the highest order" not otherwise served. *Yoder*, 406 U.S. at 216, 92 S.Ct. at 1533.

UNK administrators cite a 1970 district court decision, *Pratz v. Louisiana Polytechnic Institute*, 316 F.Supp. 872 (W.D.La.1970), *appeal dismissed*, 401 U.S. 951, 91 S.Ct. 1186, 28 L.Ed.2d 234, *summarily aff'd per cur.* 401 U.S. 1004, 91 S.Ct. 1252, 28 L.Ed.2d 541 (1971), in support of their interest in enforcing the freshman housing policy.[30] In that case the majority of a panel composed of two district judges and a circuit judge upheld—against an equal protection challenge, not a free exercise challenge—the validity of a state-supported college's parietal rule requiring all unmarried students to reside on campus. However, both district judges who voted to uphold the parietal rule in that case found that no fundamental right was at stake; thus, the rule was subject only to the deferential rational basis test. *Id.* at 884. Although the majority remarked in passing that the state's interest might survive strict scrutiny, the remark was clearly dicta. In fact, the dissenting judge, who reached the issue, found that the rule was not justified by a compelling interest.[31] *Id.* at 889 (Ainsworth, J., dissenting). Instead, he concluded that the rights of students and their parents "should not be subject to the whim or caprice of the school officials as to whether an exemption may be granted, even if the present policy relative to exemption is apparently liberal." *Id.* Moreover, the author of the majority opinion in *Pratz*, Chief District Judge Dawkins, ruled in a subsequent case two years later that Louisiana officials acted without a rational basis in implementing the

---

**29.** In *Prostrollo*, the Eighth Circuit held that a parietal rule requiring on-campus residency for all freshman and sophomore students at the University of South Dakota bore a rational relationship to the University's legitimate objective of filling dormitory vacancies. 507 F.2d at 782. The court held that the right to choose one's residency, based on secular concerns, is not a fundamental right and that the associational rights of the students did not trigger strict scrutiny, apparently because the plaintiffs did not allege that they wished to associate for the purpose of engaging in protected speech or religious activities. *See Board of Dirs. of Rotary Int'l v. Rotary Club*, 481 U.S. 537, 544, 107 S.Ct. 1940, 1945, 95 L.Ed.2d 474 (1987) (the freedom of association only protects against unjustified government interference with an individual's choice

to enter into and maintain certain intimate or private relationships, such as marriage, or an individual's choice to associate with others for the purpose of engaging in protected speech or religious activities). *Prostrollo* does not control this case because fundamental rights were not at issue in that decision. 507 F.2d at 780–82.

**30.** No other published case cited by defendants or of which the court is aware supports the conclusion that the state's interest in this case is compelling.

**31.** Chief Judge Ainsworth found that the fundamental rights of association, privacy, and parenting were implicated by the parietal rule.

rule by exempting twenty-three year old students from its application. *Cooper v. Nix*, 343 F.Supp. 1101 (1972), *aff'd in part, rev'd in part*, 496 F.2d 1285 (5th Cir.1974).

Although UNK's interest in promoting academic success, fostering diversity, promoting tolerance among UNK students, and, to a lesser extent, its interest in insuring the financial stability of its residence hall programs are legitimate and possibly even important state interests, UNK's own implementation of its parietal rule undercuts any contention that its interest is compelling.[32] Because UNK already allows exceptions to over one third of the students affected by it, any contention that denying a religious ob-

**32.** Indeed, UNK's freshman housing policy is fraught with contradictions. For example, UNK's assertions that the financial circumstance of a petitioner is not a valid ground for requesting an exception is inconsistent with its reasons for exempting students who live in the Kearney community from the rule. Students whose parents live in Kearney are excepted from the policy so that the financial cost of their education is lessened, thereby increasing the likelihood that they will stay at home and attend UNK. UNK's apparent goal of increasing its enrollment by offering a benefit to students who originate from Kearney directly contradicts the stated purposes of the policy for increasing the academic success of students and fostering diversity and tolerance among them by exposing them to the beliefs and practices of others. UNK has conducted no studies that would support its blanket exception for these students.

While students who live with parents or legal guardians are excepted from the policy, those students who wish to live with close relatives, such as aunts and uncles, are not excepted from the policy. Although UNK assumes that students living with relatives are not cared for in the manner of students living with parents, UNK has conducted no studies that support this assertion.

In addition, only students under the age of nineteen fall within the policy. If UNK actually regarded its interests in enacting the parietal rule as being of such great importance, it would no doubt require all freshmen regardless of age to comply with the rule. While UNK officials maintain that they differentiate between students younger than nineteen and students older than nineteen because that is the age of majority in Nebraska, students under the age of nineteen who are sophomores, juniors, and seniors are not subject to the rule.

Finally, I note the parties' stipulation that other branches of the University of Nebraska system do not similarly enforce any such residency requirement. If UNK's goals in enforcement of the parietal rule were of such great importance, one

server such as Douglas Rader an exception to the policy serves a compelling state interest is without merit. *Lukumi Babalu Aye*, 508 U.S. at 546–48, 113 S.Ct. at 2234; *Quaring v. Peterson*, 728 F.2d 1121, 1127 (8th Cir.1984), *summarily aff'd per cur.*, 472 U.S. 478, 105 S.Ct. 3492, 86 L.Ed.2d 383 (1985).[33] "[A] law cannot be regarded as protecting an interest 'of the highest order'.... when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi Babalu Aye*, 508 U.S. at 547, 113 S.Ct. at 2234 (quoting *The Florida Star v. B.J.F.*, 491 U.S. 524, 541–42, 109 S.Ct. 2603, 2613–14, 105 L.Ed.2d 443 (Scalia, J., concurring in part and concurring in judgment) (1989)).[34]

would expect the University to enact and enforce the policy in the same manner on all its campuses.

**33.** In *Lukumi Babalu Aye*, the Court found that the City of Hialeah's failure to enact feasible measures to restrict the slaughter of animals in other situations required it to find that the government's interest was not compelling. 508 U.S. at 546–48, 113 S.Ct. at 2234. In *Quaring*, a religious observer challenged the denial of her application for a driver's license by State of Nebraska because she refused to have her picture taken on the basis of her faith. The Court of Appeals for the Eighth Circuit wrote, "Because the state already allows numerous exemptions to the photograph requirement, the Nebraska officials' argument that denying Quarings an exemption serves a compelling state interest is without substantial merit." 728 F.2d 1121, 1127 (8th Cir.1984).

**34.** The defendants' argument that Douglas Rader knew he might be subject to the parietal rule and simply should have attended a private college is spurious. A government institution may not justify discrimination on the basis of a fundamental right by simply asserting that the victim may obtain an equivalent benefit, at a higher cost, elsewhere. *Thomas*, 450 U.S. 707, 716, 101 S.Ct. 1425, 1431, 67 L.Ed.2d 624 (1981); *Bessard v. Cal. Comm. Colleges*, 867 F.Supp. 1454, 1463–63 (E.D.Cal.1994). Likewise, it may not require that the victim wait a year to begin his or her education at the institution, rather than comply with the policy, when the institution does not apply its policy equally among all students. *Lukumi Babalu Aye*, 508 U.S. at 542–44, 113 S.Ct. at 2232. Moreover, the very case defendants cite to support their conduct, *Pratz v. Louisiana Polytechnic Institute*, 316 F.Supp. 872, 877 (1970), *appeal dismissed*, 401 U.S. 951, 91 S.Ct. 1186, 28 L.Ed.2d 234 *aff'd summarily per cur.* 401 U.S. 1004, 91 S.Ct. 1252, 28 L.Ed.2d 541 (1971), recognized that "a student does not give up any

■ Moreover, even if the parietal rule served a compelling interest in this case, the rule must be "narrowly tailored in pursuit of those interests." *Lukumi Babalu Aye*, 508 U.S. at 546, 113 S.Ct. at 2233. There was no persuasive evidence at trial demonstrating any connection, much less a "narrow tailoring," between UNK's parietal rule as applied and its first three stated purposes.

Additionally, to a great extent CSF appears to meet the University's stated purposes for the parietal rule, at least as much as UNK's residence halls. First, the facility is located within a hundred feet of the south edge of the UNK campus and is closer in proximity to the heart of the UNK campus than many of the University's residence halls. (Exhibit 33). Thus, academic services, such as tutoring, are as readily available to residents of CSF as they are to students residing in UNK's dormitories. The facility houses twenty-two students and has often housed students from various foreign countries, including Jamaica, Japan, Columbia, and Kenya.[35] Academic resources, counseling, supervision by upper-class students, and support from peers are available to Rader just as they would be in a dormitory.[36] Moreover, Rader encounters students of different beliefs on a daily basis in his classes, at his employment, and during basketball practices. Thus, the goals of the University in fostering diversity and ensuring the academic success of its students are to a large extent met by his residency at CSF. *See Wisconsin v. Yoder*, 406 U.S. 205, 212, 224, 92 S.Ct. 1526, 1531–32, 1537–38, 32 L.Ed.2d 15 (1972) (the state's goals in compulsory education were met with respect to the Amish after their children had completed the eighth grade). Undoubtedly, these goals are fulfilled to a much greater degree if a student lives at CSF rather than at home in the Kearney community, a circumstance in which UNK automatically grants exceptions. In fact, the stringent code of conduct in effect at CSF would likely produce an environment much more conducive to academic pursuits than that in the residence halls. In short, enforcement of the parietal rule is clearly not "narrowly tailored" to further a compelling state interest.

## CONCLUSION

■ Although UNK's parietal rule is neutral on its face, Douglas Rader has shown that the defendants have enforced the rule against him in a manner that is not neutral or generally applicable. The defendants, in turn, have not demonstrated that their enforcement of the parietal rule is narrowly tailored to further a compelling state interest. Though there is no constitutional right to a free public education, the state may not unequally condition access to a public education on performance of an act—here residing in a residence hall—that infringes the exercise of First Amendment rights. *Lukumi Babalu Aye*, 508 U.S. at 546–48, 113 S.Ct. at 2234; *Thomas*, 450 U.S. 707, 716, 101 S.Ct. 1425, 1431, 67 L.Ed.2d 624 (1981). Accordingly, judgment will be enter for the plaintiff, Douglas Rader.

**IT THEREFORE HEREBY IS ORDERED:**

1. The defendants' enforcement of the University of Nebraska–Kearney's freshman housing policy, in its present form and application, against the plaintiff, Douglas Rader, is declared unconstitutional under the First Amendment to the United States Constitution.

2. The defendants and their agents, officers, assigns, and successors are ordered to refrain from enforcing in any way the University of Nebraska–Kearney's freshman housing policy against the plaintiff, Douglas Rader.

3. Judgment shall be entered for the plaintiff in accordance with the foregoing.

---

basic constitutional right when he enters a State college or university[.]"

**35.** It is important to note over ninety percent of the students who reside in UNK's residence halls are white and to a great extent these students hail from small towns in rural Nebraska.

**36.** No evidence was adduced regarding any quantitative comparison of "academic success" as between dormitory residents and CSF residents, nor as to the reasons for any perceived differences. Rader performed strongly in his classes during his first semester at UNK.

4. In accordance with Federal Rule of Civil Procedure 54(d)(2) and Nebraska Local Rule 54.3, plaintiff is given fourteen days to file an application for attorney's fees, supported by appropriate evidence and authority. The application shall disclose any fee agreement between plaintiff and counsel. Defendants are given fourteen days thereafter to respond.